[No. S012945. July 21, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY BERNARD DAVIS, Defendant and Appellant.

COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, Jay Colangelo, Assistant State Public Defender, and Ellen J. Eggers, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Lisa J. Brault, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted defendant Stanley Bernard Davis of the first degree murders of Michelle Boyd and Brian Harris. (Pen. Code, § 187; further undesignated statutory references are to the Penal Code.) As to each murder, the jury found true the special circumstance allegations of murder during the commission of a robbery and murder during the commission of kidnapping for robbery. (§ 190.2, former subd. (a)(17)(i) & (ii), as added by initiative, Prop. 7, § 4 at the Nov. 7, 1978 Gen. Elec.) The jury also found true a special circumstance allegation of multiple murder. (§ 190.2, former subd. (a)(3).) The jury further found defendant guilty of the robbery (§ 211) and kidnapping for robbery (§ 209, subd. (b)) of Boyd and Harris, grand theft auto (§ 487, former subd. (3))[1] and arson of Harris's automobile (§ 451, subd. (d)) all committed in 1985, and the 1984 robbery (§ 211) and kidnapping for robbery (§ 209, subd. (b)) of David Kingsmill. As to the murders, robberies, and kidnappings of Boyd and Harris, and the theft of Harris's car, the jury found for each offense that defendant was armed with a firearm (§ 12022, subd. (a)) and that he personally used a firearm (§ 12022.5, subd. (a)). With respect to the robbery and kidnapping of Kingsmill, the jury found for each offense that a principal was armed with a firearm. (§ 12022, subd. (a).)

At the penalty phase, the jury returned verdicts of death for the Boyd and Harris murders. The trial court denied defendant's automatic motion to modify the verdict (§ 190.4, subd. (e)) and imposed death sentences for those counts. The court imposed terms of imprisonment for the other counts, but it stayed them pending imposition of the death penalty.

This appeal is automatic. (§ 1239, subd. (b).) We vacate the conviction for the robbery of Boyd, but otherwise affirm the judgment.

## I. FACTUAL BACKGROUND

A jury convicted defendant of the 1985 kidnapping, robbery, and first degree murders of college students Michelle Boyd and Brian Harris. Three other men—DeAndre Brown, Damon Redmond and Donald Bennett—were

---

[1] Section 487, former subdivision (3), is now section 487, subdivision (d)(1).

involved in the crimes. Brown was the prosecution's primary witness; he admitted being present at the murder scene and purchasing the murder weapon, an Uzi semiautomatic pistol. Brown testified that he, defendant, Redmond, and Bennett drove from South Central Los Angeles to Westwood, where they commandeered Harris's car, with students Boyd and Harris inside, because they needed a car to carry out a planned robbery. Brown testified that after driving to an isolated location, defendant took Boyd and Harris out into a field and shot them. The prosecution also introduced incriminating statements defendant made, which the police tape-recorded while defendant was in jail with Redmond and Bennett. A year before the Boyd and Harris murders, defendant kidnapped and robbed David Kingsmill, also in Westwood.

## A. Guilt Phase

### 1. Prosecution's case

#### a. Kingsmill kidnapping and robbery

In 1984, David Kingsmill was a student at the University of California at Los Angeles, in Westwood. On May 27, about 11:00 p.m., as Kingsmill was getting out of his new black Volkswagen Rabbit, he felt a gun at his neck and heard someone tell him to turn around and get back in the car. Kingsmill did so. Defendant and two other African-American men got in after him. One of the men told Kingsmill to drive where he was told. Ultimately, Kingsmill stopped somewhere on Sepulveda Boulevard and gave the three men his wallet, money, and credit cards. He then complied with their demand to get out of the car and take off his pants and underwear. The three men left, taking Kingsmill's clothes. Four days later, deputy sheriffs stopped defendant in South Central Los Angeles while he was driving with DeAndre Brown in a new black Volkswagen Rabbit. With respect to this incident, defendant pleaded guilty to one misdemeanor count of unlawfully taking a vehicle (Veh. Code, § 10851) for which he served a two-month jail sentence.

#### b. Boyd and Harris murders

Testifying under a grant of immunity, DeAndre Brown gave the following account of the murders. In September 1985, defendant was living with his friend Brian Wright at the house of Wright's grandmother in South Central Los Angeles. On September 26, defendant and Wright were arrested. Defendant was able to post bail but Wright was not. A few days later, defendant told Brown about a plan to drive to Barstow, San Bernardino County, and rob a liquor store to get money to post Wright's bail. Brown agreed to take part in the planned robbery.

A few days later, on September 30, around 7:00 p.m., Brown and Damon Redmond met up with defendant and Donald Bennett, who was driving a truck. The four discussed the planned Barstow robbery. They decided to drive to Westwood to get a car because Bennett did not want to use his truck in the robbery. The group had with them a nine-millimeter Uzi semiautomatic pistol and a .38-caliber handgun. The four arrived in Westwood around 9:00 p.m. They split up and went looking for a car to steal. Brown and Redmond saw a man and a woman in a beige or rust-colored Honda and told defendant about the car. Defendant and Redmond went to investigate. When they returned to Bennett's truck, Redmond was driving the Honda, with defendant in the backseat. At Bennett's instruction, Brown grabbed the Uzi, which was loaded, from the back of the truck. When Brown approached the Honda, he saw victim Michelle Boyd in the backseat next to defendant, with her head in his lap. Brown also got in the backseat. Bennett took the front passenger seat.

Redmond drove a short distance, then stopped to let Bennett drive. Bennett drove near a high school. It was around midnight and the area was "pitch black," with no lights or houses around. Defendant signaled Bennett to stop the car. Defendant, Redmond, and Brown got out, taking Boyd with them. Brown handed defendant the Uzi. Brown saw defendant take Boyd out into a field but then lost sight of them. Brown then heard thumping from inside the Honda's trunk and a voice yelling "let me out." When defendant returned to the car, Redmond opened the trunk hood and Brian Harris emerged holding his hands over his eyes. Harris said he could not see and would not look. Defendant, still holding the Uzi, told Harris, "I'm going to take you to your girl." He and Redmond then walked Harris out into the field. Brown saw Redmond walking back toward the car and then saw a flash of light in the field. A second flash followed, after which defendant returned to the car. When Brown asked defendant what he had done, defendant said he had "killed 'em" because he did not want any witnesses.

Defendant, Brown, Bennett, and Redmond then drove away, with Bennett at the wheel, planning to drive northeast from Los Angeles to Barstow to rob the liquor store. Brown fell asleep. He awoke to defendant's yelling at Bennett because they had ended up in Bakersfield, in Kern County, north of Los Angeles, about 130 miles from Barstow. Eventually the group drove to Barstow and arrived at the liquor store they planned to rob. Brown went in to check out the store, but came back and reported that there were people inside and it "wasn't cool." The four then headed back to Los Angeles, arriving about 6:00 or 7:00 a.m. on October 1.

Brown got out at a bus stop a few miles from his home. He took the Uzi with him, hidden in a brown briefcase he had found in victim Harris's car. He stored the gun and the briefcase in his bedroom.

Later that morning, Brown saw defendant, Redmond, and Bennett near their homes in South Central Los Angeles. Redmond had burns on his face and hands, received when he had poured gasoline on victim Harris's Honda and lit it. Either Bennett or defendant handed Brown the .38-caliber handgun, which he left in Redmond's house. Either Redmond or defendant gave Brown a wire ring. Redmond kept another ring, which looked like a high school class ring with a stone. Brown still had the wire ring in his bedroom when he was arrested; later he gave it to his girlfriend. (Victim Boyd always wore a small gold twisted wire ring and a high school senior class ring; after the murders, there were no rings on her body.)

### c. *The arrests and interrogations*

On October 1, 1985, about 8:30 a.m., James Shubsda arrived at the auto store where he worked in South Central Los Angeles. He noticed a brownish-colored Honda parked in the alley behind the store. About 15 minutes later, Shubsda heard an explosion. He ran into the alley, saw the Honda on fire, and called the fire department. Arson investigator Derek Chew of the City of Los Angeles Fire Department examined the Honda and determined that someone had poured gasoline inside it and set it on fire. Victim Harris's wallet was in the trunk of the car. The police found only one fingerprint on the car; it belonged to Redmond.

The police looked up Redmond's known associates and found, among others, Brown and defendant, whom they discovered had been involved in the 1984 kidnapping and robbery of college student David Kingsmill. They determined that Kingsmill's car had been taken only a few blocks from where college students Boyd and Harris were last seen in Westwood, and that Brown, Redmond, and defendant all lived within 12 blocks of where Harris's Honda had been abandoned in South Central Los Angeles. Brown, Redmond, and defendant thus became suspects in the disappearance of Boyd and Harris.

Officer David Evans of the Los Angeles Police Department was the investigating officer on the Boyd and Harris murders. He arrested Redmond around 6:00 a.m. on Sunday, October 6, 1985. Redmond had burns on his face and hands. Other officers arrested Brown about the same time. A search of Brown's bedroom turned up a brown briefcase with an Uzi and a loaded magazine inside.

Later that day, Officer Evans and Detective Richard DeAnda questioned Brown and Redmond at the West Los Angeles police station. Brown admitted involvement in the kidnappings of Boyd and Harris and also implicated defendant, Redmond, and Bennett. Brown said that defendant had shot and killed both victims. Brown then led the police to the bodies of

Harris and Boyd, in a field near a high school on Mulholland Drive. Searches of the field turned up two shell casings.

Still later that Sunday, October 6, 1985, Officer Evans and Detective DeAnda questioned Redmond, who admitted being present at the murder scene. That afternoon, defendant surrendered and was taken to the West Los Angeles station. Bennett was arrested on October 8. During questioning, he admitted being present at the murder scene.

### d. *The jailhouse conversations*

At trial, the prosecution introduced excerpts of incriminating statements by defendant that police had tape-recorded during conversations that defendant had with Redmond and Bennett while the three were being held at the West Los Angeles station before they were charged.

### e. *Other trial evidence*

The parties stipulated that both Harris and Boyd died of single gunshot wounds to the head. A pathologist from the Los Angeles County Chief Medical Examiner Coroner's Office recovered a bullet from Harris's head.

A firearms expert test-fired the Uzi recovered from Brown's bedroom and compared the resulting bullets and shell casings with the bullet removed from Harris's head and the casings found at the murder scene. In his opinion, the casings and bullets were fired from that Uzi.

### 2. *Defense case*

The defense tried to undermine Brown's credibility and to inculpate him as the shooter of Boyd and Harris. Los Angeles Police Department Detective Hugh Wilton, whom the defense called as a witness, testified that he had found the briefcase containing the Uzi and a loaded magazine in Brown's bedroom. To discredit Brown's testimony that the crime scene was "pitch black," two witnesses testified that nearby streetlights were working on the night of the murders, and the parties stipulated that the moon was nearly full that night.

### B. *Penalty Phase*

#### 1. *Prosecution's evidence in aggravation*

Much of the prosecution's aggravating evidence was presented by stipulation of the parties, including these facts: Defendant was born on March 19,

1962, making him 23 years old at the time of the murders in 1985. In 1980, he pled guilty to unrelated felony charges of grand theft auto and assault with a deadly weapon in which the victim sustained three stab wounds. As a result of those convictions, defendant was incarcerated for most of the period between May 29, 1980, and April 10, 1983. When defendant committed the assault, he was on probation for the grand theft auto conviction, and at the time of the Boyd and Harris murders in this case, he was on probation based on his unlawfully taking the car of college student Kingsmill in 1984.

In 1981, when defendant was a ward at the California Youth Authority at Chino, he threw hot water on a counselor. In 1982, when defendant was an inmate at Soledad State Prison, he pushed a correctional officer through a doorway.

### 2. *Defense evidence in mitigation*

Several friends and family members testified about defendant's difficult childhood and adolescence. Shortly after defendant's birth, his mother, Della Moore, relinquished him to another woman, Ruby Orr. When Orr later married Joe Davis, the two raised defendant as their own son together with their two younger sons, Delano and Antoine. Orr abused defendant both physically and psychologically. She hit defendant with her fist and various items including switches, paddles, ironing cords, and a baseball bat. She verbally denigrated defendant and forced him to take care of the younger brothers, whom she favored. Orr and Davis had a violent relationship. Orr once shot Davis and once stabbed him. When defendant was a teenager, Davis and Orr divorced. Orr then held late night gambling parties in her house. When defendant was 18 or 19 years old, he learned that Orr was not his birth mother.

Clinical Psychologist Adrienne Davis, not related to defendant, testified about her psychological evaluation of defendant. Defendant scored in the borderline range on intelligence tests, between low average intellectual function and mild mental retardation. He scored at the fourth grade level in reading and math. Personality tests indicated that defendant had emotional and psychological problems, particularly with trusting and relating to other people, consistent with his history of physical and emotional abuse and exposure to family violence. On neuropsychological tests, defendant had difficulty with certain tasks, including problem solving. Davis described defendant generally as feeling isolated, inadequate, alienated, angry, frustrated, and confused. As the result of being incarcerated for most of his adult life, defendant lacked the necessary skills to cope with life outside of prison. He probably would function better in a closed environment.

### 3. *Prosecution's rebuttal*

Defendant's younger brother, Antoine Davis, who was 17 years old at the time of trial, denied that Orr had ever hit defendant with a baseball bat.

## II. DISCUSSION

### A. *Jailhouse Taping*

Defendant contends that the tape-recording by the police of his conversations with Bennett and Redmond while the three were housed near each other in holding cells at the West Los Angeles police station violated his rights under the Fourth Amendment to the federal Constitution requiring reversal. We disagree.

### 1. *Facts*

Before trial, defendant moved to suppress the tape recordings and transcripts of his jailhouse conversations with Redmond and Bennett, citing the Fourth Amendment to the federal Constitution and former section 2600 as construed in this court's decision in *DeLancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142] (*DeLancie*). At the hearing on the suppression motion, Detective DeAnda testified that after the police arrested and interviewed defendant, Redmond and Bennett, the three were placed in separate but adjacent cells in an isolated holding area for felony suspects in the West Los Angeles police station.[2] A solid wall and a steel door separated defendant, Redmond and Bennett from the rest of the facility.

Detective DeAnda testified that he had monitored and taped the three suspects' jailhouse conversations to ascertain whether they were threatening the safety of DeAndre Brown, who was cooperating with the police investigation. Former Deputy District Attorney Richard Neidorf (who, at the time of the hearing, was a Los Angeles Municipal Court judge) gave a different account of the reason for the taping. The parties agreed to the admission of Neidorf's declaration as his stipulated testimony. It states: "Before any arrests were made[,] I was at the West L.A. police station preparing arrest and search warrants. I arrived at approximately 9 p.m. on a Saturday and stayed past midnight. [¶] I suggested to Los Angeles Police Department officers, a lieutenant for sure and possibly Detective DeAnda to eavesdrop the jail, after the suspects were apprehended. I told them not to put any informants in the cell nor to put any undercover police officers in the cell. Just to let the

---

[2] Other evidence in the record suggests that after questioning defendant, the police took him to the Van Nuys police station, but brought him back to West Los Angeles some time before the taping.

defendants freely talk among themselves. [¶] When I suggested the eaves-dropping I told the officers the reason was to gather information. My concern in gathering information was to decide which of the perpetrators to seek death against in that *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862],[3] was the law at the time and who [*sic*] to charge 12022.5, personal use of a firearm and exculpatory evidence regarding . . . *Beamon*-type [*People v. Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905]] evidence or any evidence regarding factual innocence. [¶] At this time the warrants had not been signed yet and therefore no suspects had been arrested."

The trial court denied defendant's suppression motion. It found that the taping had a dual purpose: first, to gather evidence against the defendants, and second, to obtain information regarding the safety of Brown. The trial court explained: "A conscious decision was reached by the officer to tape-record and monitor the conversations of these defendants. And it was based on a reasonable suspicion that there might be conversations pertaining to the crime for which they had been arrested. [¶] And let's face it. It's clear to me that the original purpose in deciding to tape-record or monitor was to secure evidence to prosecute . . . . [¶] And, finally, I'm forced to the conclusion or come to the conclusion that . . . the reasonable protection of the public was involved ultimately before the taping began. [¶] Before this taping began, a secondary consideration arose in the mind of the officer, and that was the protection of Brown. . . . [¶] And when it comes to protecting Brown—and I think it was very reasonable to expect that Brown would be in danger here—there's nothing better than knowing what these people are planning. . . . [¶] There was bona fide interest in information pertaining to the safety of Brown prior to the commencement of the taping."

### 2. *Discussion*

In several cases we have rejected defendants' Fourth Amendment challenges to the admission of evidence obtained by tape-recording conversations in jail. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1183–1184 [96 Cal.Rptr.2d 1, 998 P.2d 969] [conversation between a defendant and family members in a

---

[3] Our decision in *Carlos v. Superior Court, supra,* 35 Cal.3d 131 (*Carlos*) held that the felony-murder special circumstance of the 1978 death penalty law required proof of intent to kill regardless of whether the defendant was the actual killer or an accomplice. Later, we overruled *Carlos* in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. There, we concluded that intent to kill is not an element of the felony-murder special circumstance, but when the defendant is an aider and abettor rather than the actual killer, intent to kill must be proved. (*Id.* at p. 1147.) Thereafter, we held that *Carlos* applies when, as in this case, the crime was committed after *Carlos* but before *Anderson*. (See *People v. Osband* (1996) 13 Cal.4th 622, 679 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Johnson* (1993) 6 Cal.4th 1, 44–45 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

jail visiting room]; *People v. Hines* (1997) 15 Cal.4th 997, 1043 [64 Cal.Rptr.2d 594, 938 P.2d 388] [conversation between a defendant and another suspect in a jail holding cell before they were charged]; *Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 28–30 [196 Cal.Rptr. 704, 672 P.2d 110] [conversation between a defendant and his brother in a police station interview room].) Those cases relied on *Lanza v. New York* (1962) 370 U.S. 139 [8 L.Ed.2d 384, 82 S.Ct. 1218], in which the United States Supreme Court concluded that Fourth Amendment protections do not apply inside a jail because a jail "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room" and "[i]n prison, official surveillance has traditionally been the order of the day." (*Lanza, supra,* 370 U.S. at p. 143.)

Defendant contends that *Lanza* was long ago superseded by other United States Supreme Court decisions. He notes that a few years after *Lanza,* the high court held in *Katz v. United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 88 S.Ct. 507] (*Katz*), that the Fourth Amendment protects "people, not places," and thus he asserts that the location of a tape-recorded conversation (whether in a jail cell or not) should not be dispositive of whether it enjoys Fourth Amendment protection. Rather, according to defendant, the appropriate test is the one set out in Justice Harlan's concurring opinion in *Katz,* asking whether the subject of the taping had an actual, subjective expectation of privacy that society recognizes as reasonable. (*Katz, supra,* at p. 361 (conc. opn. of Harlan, J.).) Defendant notes that the high court applied that test in a jail context in *Bell v. Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861] (*Bell*). In *Bell,* the high court assumed, without deciding, that pretrial detainees retain an expectation of privacy, albeit a diminished one. The court concluded, however, that cell searches did not violate the Fourth Amendment if they were reasonably related to legitimate institutional security needs. (*Bell, supra,* at pp. 556–557.) Five years after *Bell,* the high court decided *Hudson v. Palmer* (1984) 468 U.S. 517 [82 L.Ed.2d 393, 104 S.Ct. 3194] (*Hudson*); it holds that convicted *prisoners* have no legitimate expectation of privacy in their cells, and thus no Fourth Amendment protection from cell searches.[4] (*Hudson, supra,* at pp. 522–530.)

Defendant here argues that under the reasoning of *Bell* and *Hudson,* persons who are in custody and have not yet been convicted have privacy interests that the Fourth Amendment protects from intrusion absent a legitimate institutional security interest. According to defendant, he had an expectation of privacy that precluded recording his conversations for reasons other

---

[4] The parties also cite *Block v. Rutherford* (1984) 468 U.S. 576 [82 L.Ed.2d 438, 104 S.Ct. 3227], decided on the same day as *Hudson. Block* involved only a due process challenge to certain jail security practices and therefore is not particularly helpful in analyzing defendant's Fourth Amendment claim.

than jail security. He relies on the fact that at the time of the taping he had not been charged with any crime. He thus reasons that his expectation of privacy in the jail cell was at least equal to that of the pretrial detainees in *Bell, supra,* 441 U.S. at pages 556–557, and greater than that of the convicted prisoners in *Hudson, supra,* 468 U.S. at pages 522–530. He further asserts that no legitimate security reasons existed here based on the stipulated testimony of former Deputy District Attorney Neidorf that he had ordered the taping "to gather information." We are not persuaded.

Preliminarily, we note that various federal and state appellate courts have disagreed with regard to whether the high court's decision in *Hudson* that convicted prisoners lack any expectation of privacy in their cells applies with equal force to persons who are still facing trial. One line of cases, beginning with *United States v. Cohen* (2d Cir. 1986) 796 F.2d 20, holds that persons being held before trial retain a limited expectation of privacy that protects them from searches conducted for other than legitimate security reasons. (See *United States v. Friedman* (2d Cir. 2002) 300 F.3d 111, 123; *United States v. Willoughby* (2d Cir. 1988) 860 F.2d 15, 20–22 [intercepted conversations admissible where taping was a justifiable security measure]; *Cohen, supra,* at p. 24 [warrantless cell search solely to obtain information for prosecution violated Fourth Amendment]; *Rogers v. State* (Fla. 2001) 783 So.2d 980, 990–992 [same]; *McCoy v. State* (Fla.Dist.Ct.App. 1994) 639 So.2d 163, 167 [same]; *State v. Henderson* (1999) 271 Ga. 264 [517 S.E.2d 61, 62–64] [same]; *Lowe v. State* (1992) 203 Ga.App. 277 [416 S.E.2d 750, 752] [same]; *State v. Neely* (1990) 236 Neb. 527 [462 N.W.2d 105, 112] [*Hudson* inapplicable to search of pretrial detainee's luggage held in jail's locked inventory]; *State v. Jackson* (1999) 321 N.J. Super. 365 [729 A.2d 55, 63–65] [evidence suppressed where security concern was merely a pretext for an evidence-gathering search]; see also *United States v. Hearst* (9th Cir. 1977) 563 F.2d 1331, 1345; see generally 4 LaFave, Search and Seizure (3d ed. 1996) § 10.9(d), pp. 754–755.) We cited *Cohen* in *People v. Hardy* (1992) 2 Cal.4th 86, 181 [5 Cal.Rptr.2d 796, 825 P.2d 781], in rejecting a claim that a jail cell search violated the detainee's Sixth and Fourteenth Amendment rights.

Another line of cases, however, construes *Hudson* as validating *any* jailhouse search, regardless of its purpose, and as applying to persons incarcerated before trial as well as to convicted prisoners. (See *State v. Apelt* (1993) 176 Ariz. 349 [861 P.2d 634, 649]; *State v. O'Rourke* (2001) 2001 ME 163 [792 A.2d 262, 265–267]; *People v. Phillips* (1996) 219 Mich.App. 159 [555 N.W.2d 742, 743–744]; *State v. Wiley* (2002) 355 N.C. 592 [565 S.E.2d 22, 32–33]; *State v. Martin* (1988) 322 N.C. 229 [367 S.E.2d 618, 620–622] [*Hudson*'s reasoning equally applicable to pretrial detainees in jails]; *Soria v. State* (Tex.Crim.App. 1996) 933 S.W.2d 46, 60 [same]; see also *People v. Von Villas* (1993) 11 Cal.App.4th 175, 212–216 [15 Cal.Rptr.2d 112] [pretrial

detainee had no expectation of privacy in conversation with wife in jail visiting room]; *United States v. Van Poyck* (9th Cir. 1996) 77 F.3d 285, 290–291 [pretrial detainee had no expectation of privacy in phone calls from jail].)

■ We agree with this latter line of cases that persons held pretrial in a jail—as defendant was when the police recorded his conversations with Redmond and Bennett—have no expectation of privacy for the following reasons. First, *Hudson*'s rationale, that jail security requires "close and continued surveillance of inmates and their cells" (*Hudson, supra,* 468 U.S. at p. 527), extends to anyone being held in a jail. Indeed, in *Bell* the high court recognized that pretrial detainees pose similar—if not the same—security concerns as convicted prisoners. (See *Bell, supra,* 441 U.S. at pp. 546–547, fn. 28 ["[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates"].) As Justice O'Connor has suggested, it is "[t]he fact of *arrest* and incarceration [that] abates all legitimate Fourth Amendment privacy and possessory interests in personal effects [citations] and therefore all searches and seizures of the contents of an inmate's cell are reasonable." (*Hudson, supra,* 468 U.S. at p. 538 (conc. opn. of O'Connor, J.), italics added.)

Second, *Hudson* applies to jailhouse searches regardless of the purpose of the search. (See *Hudson, supra,* 468 U.S. at pp. 529–530 [rejecting claim that search violated Fourth Amendment because it was designed solely to harass].)

Third, although *Hudson* involved the physical search of a cell, its rationale extends as well to eavesdropping. *Lanza* and *Katz* were eavesdropping cases, yet the United States Supreme Court drew on those cases in *Hudson.* (See *Hudson, supra,* 468 U.S. at p. 525 [applying *Katz* expectation of privacy test in cell search context]; see also *Bell, supra,* 441 U.S. at pp. 556–557 [citing *Lanza* in cell search context].)

As a separate reason supporting his claim that the tape-recording violated his Fourth Amendment rights, defendant points out that it took place in 1985, when, he argues, California law provided persons incarcerated in this state with a reasonable expectation of privacy. Defendant relies on former section 2600 as construed in this court's 1982 decision in *DeLancie, supra,* 31 Cal.3d 865.

Under former section 2600, state prison inmates could "be deprived of such rights, and only such rights, as . . . necessary . . . to provide for the reasonable security of the institution . . . and for the reasonable protection of the public." (Stats. 1975, ch. 1175, § 3, p. 2897.) *DeLancie* held that former section 2600 protected pretrial detainees as well as prison inmates and

precluded the recording of a pretrial detainee's conversations with visitors and other detainees for reasons other than jail security or protection of the public. (*DeLancie, supra,* 31 Cal.3d at p. 876.)[5] Because former section 2600 as construed in *DeLancie* was the controlling law when the officers recorded defendant's conversations in jail, he asserts that he must have had an expectation of privacy in his jail cell that society was "prepared to recognize as reasonable." (See *People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3] [reasonable expectation is one that has " ' "a source outside of the Fourth Amendment" ' "].)

We disagree. We have already concluded that under *Hudson, supra,* 468 U.S. 517, pretrial detainees can have no legitimate expectation that their jailhouse conversations will not be monitored or recorded. *DeLancie,* which was decided before *Hudson,* distinguishes permissible searches from impermissible ones based on the purpose of the search: security searches are permissible, while investigatory searches are not. *Hudson,* however, does not recognize that distinction. Rather, as we have explained, under *Hudson* the purpose of a search has no bearing on the question whether a legitimate expectation of privacy exists. (See *Hudson, supra,* 468 U.S. at pp. 529–530.) In other words, if a pretrial detainee can reasonably expect that his cell may be monitored or searched for security reasons, then he cannot reasonably expect any privacy. It is the fact that an intrusion may occur, not the reason for the intrusion, that vitiates the expectation of privacy. Accordingly, although under *DeLancie* defendant reasonably could have expected that the police and prosecution would not violate *state* law by monitoring his conversations for investigatory reasons, that expectation was basically irrelevant to the Fourth Amendment question.

Moreover, even were we to conclude that defendant retained some legitimate expectation of privacy in jail that protected him from a warrantless tape-recording of his conversations absent a legitimate security interest, here, the officers conducted the tape-recording in part, as the trial court found, to further just such an interest—the protection of DeAndre Brown, who was providing evidence against defendant.

██ When considering a trial court's denial of a suppression motion, "we view the record in the light most favorable to the trial court's ruling,

---

[5] In 1994, the Legislature amended section 2600 to read as it presently does that prison inmates may "be deprived of such rights . . . as [are] reasonably related to legitimate penological interests." That amendment, we held in *People v. Loyd* (2002) 27 Cal.4th 997 [119 Cal.Rptr.2d 360, 45 P.3d 296], restored the pre-*DeLancie* state of the law, allowing law enforcement officers, after the effective date of the amendment, "to monitor and record unprivileged [jailhouse] communications . . . to gather evidence of crime." (*Id.* at p. 1010; see also *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 120 [105 Cal.Rptr.2d 46, 18 P.3d 1198].)

deferring to those express or implied findings of fact supported by substantial evidence." (*People v. Jenkins* (2001) 22 Cal.4th 900, 969 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 182 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].) We independently review the trial court's application of the law to the facts. (*People v. Jenkins, supra,* at p. 969; *People v. Alvarez, supra,* at p. 182.)

Here, substantial evidence supports the trial court's finding that a legitimate security interest—protecting Brown—justified the jailhouse recording. Detective DeAnda testified at defendant's suppression hearing to the following facts: the purpose of the tape-recording was to determine whether defendant or his co-suspects were threatening Brown's safety; Brown had told DeAnda that Brown feared for his safety because he saw defendant shoot the two victims;[6] and Brown said that defendant was a member of the East Coast Crips gang. Moreover, at the time of the taping, Brown was a potential prosecution witness against defendant in a capital murder case. It thus was reasonable for Detective DeAnda to believe that, even if Brown was jailed separately from defendant, defendant's friends might retaliate against Brown for informing on defendant. DeAnda's testimony amply supports the trial court's conclusion that the police had a bona fide concern for Brown's safety, which justified the taping.

Defendant raises several other contentions. For example, he argues that the safety concern expressed by the police was a pretext developed to justify an otherwise illegal taping; that Detective DeAnda's subjective concern for Brown's safety was insufficient to justify the tape-recording absent articulable facts providing a basis for such a concern; that the police helped to create the danger to Brown by revealing Brown's cooperation to defendant and by housing Brown separately from defendant, Redmond, and Bennett; and that the taping was improper because it was not "routine." We have examined each of these contentions and determined that none has merit.

### B. *Defendant's Absence from Pretrial Hearing on Tape Excerpts*

Defendant contends that his right to due process under the federal Constitution, as well as his state constitutional and statutory rights, were violated

---

[6] Defendant contends that in none of Brown's tape-recorded conversations with police does he express fear for his own safety. DeAnda testified, however, that he had conversations with Brown that were not taped. Moreover, DeAnda's concern for Brown's safety could have been based on considerations independent of what Brown told him. Accordingly, the lack of a tape-recorded expression of fear by Brown does not undermine the trial court's conclusion that a bona fide security concern justified the taping.

when the trial court failed to ensure his presence at a May 16, 1989 pretrial hearing regarding admissibility of the jailhouse tape.

Although defense counsel had earlier indicated that defendant would be present at the hearing, counsel stated at the start of the hearing that defendant was aware of the purpose of the hearing but had decided to "waive his presence." At the hearing, the trial court and counsel reviewed each of the 51 tape excerpts that the prosecution sought to have admitted into evidence, in order to reach an agreement as to the words being spoken so that a transcript of the tape could be prepared. Defense counsel and the prosecutor then argued the admissibility of the excerpts, and the trial court ruled that 49 of the excerpts would be admitted. The taped excerpts were presented at trial together with the agreed-upon transcript of the conversations on the tape.

Defendant now makes the following assertions: (1) his absence from the hearing violated his constitutional and statutory rights (see *Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 107 S.Ct. 2658]; *Snyder v. Massachusetts* (1934) 291 U.S. 97, 105–106 [78 L.Ed. 674, 54 S.Ct. 330]; *People v. Lucero* (2000) 23 Cal.4th 692, 717 [97 Cal.Rptr.2d 871, 3 P.3d 248]; see also §§ 977, subd. (b)(1), 1043); (2) defense counsel's purported waiver of defendant's presence was ineffective; and (3) conducting the hearing in defendant's absence resulted in the admission at trial of highly prejudicial portions of the jailhouse tape. The Attorney General counters that defendant, through counsel, validly waived his federal constitutional right to presence at the hearing, and that although defendant's purported waiver of his state statutory right to be present was ineffective, his presence was not statutorily required and any state law error was harmless.

We conclude that this claim fails because defendant suffered no prejudice.

■ We have summarized the federal law governing a defendant's presence at trial as follows: " 'A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution . . . . [Citations.] A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.] A defendant's presence is required if it "bears a reasonable and substantial relation to his full opportunity to defend against the charges." [Citation.]' " (*People v. Lucero, supra,* 23 Cal.4th at pp. 716–717; see *People v. Waidla* (2000) 22 Cal.4th 690, 742 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The standard under sections 977 and 1043 is similar. " '[T]he accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him . . . . [Citation.]' [Citation.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Waidla, supra,* 22 Cal.4th at p. 742.)

Here, defendant had both a statutory and a constitutional right to be present at the May 16, 1989, hearing during which the contents of the jailhouse tape were discussed and agreed upon. Because defendant was personally present at the police station lockup when the tapes were made, he could have assisted his attorneys in deciphering the tape—both by identifying who was speaking in each passage, and by determining what was being said. The tape, in turn, was the sole evidence that corroborated DeAndre Brown's testimony that defendant was present during the kidnappings and robberies and personally shot both victims. Even the prosecutor agreed that defendant should be present at this hearing. Accordingly, defendant's presence bore a reasonable and substantial relationship to his ability to defend the charges against him.

Nor did defendant validly waive his right to be present under state or federal law. Section 977, subdivision (b)(1), states that in felony prosecutions "the accused *shall* be present" at certain proceedings not relevant here, and "at *all other proceedings* unless he or she shall, with leave of court, execute in open court a written waiver of his or her right to be personally present, as provided by paragraph (2)." (Italics added.) Section 977, subdivision (b)(2) further provides "[t]he accused may execute a written waiver of his or her right to be personally present, approved by his or her counsel, and the waiver shall be filed with the court." Finally, section 1043 provides that a felony defendant "shall be personally present at the trial" (*id.*, subd. (a)), but that the trial may continue in the defendant's absence if (1) the defendant persists in disruptive behavior after being warned (*id.*, subd. (b)(1)); (2) the defendant in a *noncapital* case is voluntarily absent (*id.*, subd. (b)(2)); or (3) the defendant waives his right to be present pursuant to section 977 (§ 1043, subd. (d)). "[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1)." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Here, there is no claim that defendant's disruptive behavior allowed the court to conduct the May 16, 1989 hearing in his absence, and no evidence that defendant executed a written waiver of his presence at that hearing. Accordingly, the trial court erred under sections 977 and 1043 by conducting the proceeding in defendant's absence.

Similarly, there was no valid waiver of defendant's constitutional right to presence. As with other constitutional rights, a capital defendant may waive his right to presence at trial, as long as his waiver is voluntary, knowing and intelligent under the standard set forth in *Johnson v. Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 58 S.Ct. 1019]. (See *People v. Robertson* (1989) 48 Cal.3d 18, 62 [255 Cal.Rptr. 631, 767 P.2d 1109] [defendant's written waiver of his right to be present at his sentence reduction hearing did not validly waive his right to be present at his sentencing,

because "defendant's waiver form cannot reasonably be construed to embrace a *knowing and intelligent* waiver of his presence at the time of sentence" (italics added)]; see also *People v. Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Sully* (1991) 53 Cal.3d 1195, 1238–1240 [283 Cal.Rptr. 144, 812 P.2d 163]; *People v. Lang* (1989) 49 Cal.3d 991, 1026 [264 Cal.Rptr. 386, 782 P.2d 627].) In each of these cases, however, it was the defendant himself who waived his presence; in contrast, in this case, defendant's counsel purported to waive his presence for him. It does not appear that we have addressed the question whether defense counsel may waive the defendant's presence. Some federal cases that have addressed this issue have held that defense counsel may do so, but only if there is evidence that the defendant consented to the waiver. (E.g., *Carter v. Sowders* (6th Cir. 1993) 5 F.3d 975, 981–982; *Larson v. Tansy* (10th Cir. 1990) 911 F.2d 392, 396–397; but see *United States v. Gordon* (D.C. Cir. 1987) 264 U.S. App. D.C. 334, 829 F.2d 119, 125–126 [personal on-the-record waiver of presence right required].) At a minimum, there must be some evidence that the defendant understood the right he was waiving and the consequences of doing so. (See *United States v. Nichols* (2d Cir. 1995) 56 F.3d 403, 416–417.)[7]

Here, there is scant evidence of consent, and even less evidence that defendant understood the right he was waiving and the consequences of his waiver. All the record shows is that defense counsel represented to the court that counsel had discussed the hearing with defendant and that defendant would waive his presence. There is no evidence that defense counsel informed defendant of his right to attend the hearing; nor is there evidence that defendant understood that by absenting himself from the hearing he would be unable to contribute to the discussion of the contents of the tape recording. Accordingly, we cannot conclude that defendant knowingly and intelligently waived his right to presence at the hearing.

■ We turn now to the question of prejudice. Under the federal Constitution, error pertaining to a defendant's presence is evaluated under the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Robertson* (1989) 48 Cal.3d 18, 62 [255 Cal.Rptr. 631, 767 P.2d 1109]; see *Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1172–1173.) Error under sections 977 and 1043 is state law error only, and therefore is reversible only if " 'it is reasonably probable that a result more favorable to the appealing

---

[7] Relying on *United States v. Gagnon* (1985) 470 U.S. 522 [84 L.Ed.2d 486, 105 S.Ct. 1482], the Attorney General argues that defendant validly waived his federal constitutional right to be present at the hearing by "his absence from the proceeding, which he knew was to take place and that he had a right to attend." *Gagnon* interprets Federal Rules of Criminal Procedure, rule 43 (18 U.S.C.) and is inapplicable here.

party would have been reached in the absence of the error.' (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (*People v. Jackson, supra,* 13 Cal.4th at p. 1211; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 738–739 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Defendant asserts that had he been present at the May 16, 1989 hearing, he could have assisted his attorney in deciphering the tape recording and filling in many of the portions of the transcript that were marked "unintelligible." He further asserts that some of the most prejudicial excerpts (such as excerpt 9, in which he admits to having had a chance to "get some nuts off," indicating he could have raped victim Boyd), would have been deemed irrelevant and inadmissible.

We disagree. First, defendant's attorneys had access to the tape and the proposed transcript before the May 16, 1989 hearing. Thus, they had ample opportunity to discuss the contents with defendant and to seek his assistance in deciphering the recorded conversation. Assuming they did so, defendant's presence at the hearing would have added little to his attorneys' ability to argue the admissibility of the excerpts. Further, the trial court's rulings at the May 16, 1989 hearing were without prejudice to later arguments that the transcript was inaccurate or that certain portions were not admissible. Thus, it appears that defendant's counsel could have consulted with him after the hearing, and could have brought to the court's attention at a later time any possible contributions or corrections that defendant might have made.

But even assuming defendant and his counsel had no opportunity to review the tape and transcript either before or after the hearing, there is no way on this record to determine, had defendant been present at the hearing: (1) whether he could have filled in the "unintelligible" portions of the tape and transcript;[8] (2) whether the prosecutor would have agreed to defendant's interpretation; and (3) had defendant's interpretation been agreed to, whether the resulting transcript of the tape recording would have been less prejudicial to defendant than the transcript used at trial. Because we do not know what defendant would have said about the unintelligible portions on the tape, it seems equally reasonable to assume that his clarifications would have done nothing to make the tape less incriminating or perhaps made it even more incriminating.

Second, although the transcript contains numerous passages marked "unintelligible," the vast majority of the crucial passages that linked defendant to the shooting were intelligible. As explained below at pages 537 to 538 and 546 these unblemished passages sufficed to establish defendant's identity

---

[8] It is doubtful that defendant would have waived his Fifth Amendment right not to incriminate himself by testifying at the hearing regarding the contents of the tape. Presumably, defendant's contribution to the discussion at the hearing would have been made through his attorneys.

as the shooter and provided all the legal corroboration necessary for the jury to credit Brown's testimony.

Defendant also contends that had he been present at the hearing he could have assisted his attorneys in identifying the voices on the tape. But as explained below at pages 545 to 546, the jury could have identified the voices by analyzing what was said without relying on Brown's voice identifications. Defendant's contribution to the voice identification effort, assuming he would have been willing to provide it, would not have changed the words that were on the tape or the jury's ability independently to analyze those words.

For all of these reasons, we conclude that defendant's absence from the May 16, 1989 hearing was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 23.) It follows that it is not " 'reasonably probable' " that a result more favorable to defendant would have been reached had he been present. (*People v. Jackson, supra,* 13 Cal.4th at p. 1211.)

C. *Admission of Hearsay Statements of Redmond and Bennett on Tape Excerpts*

1. *Admissibility of hearsay on the tape excerpts*

The prosecution offered into evidence 51 separate excerpts of the taped jailhouse conversations. Defendant challenged each excerpt as inadmissible hearsay (Evid. Code, § 1200) and asked the trial court to consider each excerpt separately to determine whether it fell within any hearsay exception. The court declined to do so. The court did exclude two excerpts, but it admitted the remaining 49 either as statements of defendant, as adoptive admissions, or as providing context to defendant's statements. The court also ruled that the probative value of the excerpts outweighed any prejudicial effect. (See Evid. Code, § 352.)

At trial, the tape recording (designated People's exhibit 31) and a transcript (designated People's exhibit 32) of the 49 excerpts were both admitted into evidence. Brown identified each of the speakers on the tape, and testified that the initials "DR" for Damon Redmond, "DB" for Donald Bennett, and "SD" for defendant appearing on the transcript identified the person who, in Brown's opinion, was the speaker in each passage. The court told the jury that except where the transcript indicated "unintelligible" or had words in parentheses, the parties agreed to the words on the tape but did not agree as to who said what; that the initials on the transcript reflected only Brown's opinion as to who was speaking; and that ultimately it was for the jury to decide what words were said, who said them, and what relevance those words had to the case.

Defendant now contends that 16 of the excerpts admitted into evidence contain hearsay statements by either Bennett or Redmond. He faults the trial court for declining to consider separately the admissibility of each tape excerpt, and for its giving of inadequate jury instructions on adoptive admissions, which together, he asserts, resulted in jury consideration of prejudicial hearsay statements by Redmond and Bennett, in violation of state and federal law. We disagree.

## 2. *Legal principles*

■ Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is not admissible unless it qualifies under some exception to the hearsay rule. Two hearsay exceptions are relevant here. ■ A defendant's own hearsay statements are admissible. (See *id.*, § 1220; *People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1049 [90 Cal.Rptr.2d 607, 988 P.2d 531].) A statement by someone other than the defendant is admissible as an adoptive admission if the defendant "with knowledge of the content thereof, has by words or other conduct manifested his adoption [of] or his belief in its truth." (Evid. Code, § 1221; see *People v. Preston* (1973) 9 Cal.3d 308, 314 & fn. 3 [107 Cal.Rptr. 300, 508 P.2d 300].)

■ In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true. (Evid. Code, §§ 403, 1221; *People v. Carter* (2003) 30 Cal.4th 1166, 1198 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *People v. Preston, supra,* 9 Cal.3d at p. 314 & fn. 3.) Generally, this requires separately examining each excerpt of the tape-recorded conversations. (See *Williamson v. United States* (1994) 512 U.S. 594, 599–602 [129 L.Ed.2d 476, 114 S.Ct. 2431] [trial court erred in admitting a lengthy narrative as a statement against penal interest under Federal Rules of Evidence, rule 804(b)(3) (28 U.S.C.) on the ground that it was generally self-inculpatory; rather, the trial court should have examined each individual statement or remark within the longer narrative to determine whether it was inculpatory or exculpatory]; accord, *People v. Lawley* (2002) 27 Cal.4th 102, 153 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

■ Evidence of an out-of-court statement is also admissible if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in

dispute. (*People v. Turner* (1994) 8 Cal.4th 137, 189 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People v. Armendariz* (1984) 37 Cal.3d 573, 585 [209 Cal.Rptr. 664, 693 P.2d 243].) For example, an out-of-court statement is admissible if offered solely to give context to other admissible hearsay statements. (*People v. Turner, supra,* 8 Cal.4th at pp. 189–190.)

Here, the excerpts of the recorded jailhouse conversations and the transcripts made of those recorded excerpts were evidence of statements made by someone "other than by a witness while testifying at the hearing" (Evid. Code, § 1200, subd. (a))—in other words, out-of-court statements by defendant, Redmond, and Bennett. Thus, statements on the tape qualified as hearsay to the extent the prosecution was offering those statements to prove the truth of the facts being asserted by the speaker. These statements were inadmissible unless, as relevant here, they were defendant's own statements, or they qualified as adoptive admissions of defendant, or they were offered for a nonhearsay purpose.

### 3. *Defense contentions*

Defendant argues here that seven of the excerpts of the recorded conversations were improperly admitted as adoptive admissions because defendant's response to an assertion made by Redmond or Bennett was either unintelligible or indicated defendant did not hear or understand the assertion. For example, in one exchange (excerpt 47 of People's exhibits 31 and 32) Bennett asks defendant, "You know what else I am wondering?" to which defendant responds "What?" Bennett then states, "They found it in the case he had it in," to which defendant answers "A what?" We conclude that each of these excerpts, as well as the others to which defendant now objects, were properly admitted. As explained on page 535, *ante,* a statement is admissible as an adoptive admission if "there is evidence sufficient to sustain a finding" (Evid. Code, § 403, subd. (a)) that the defendant heard and understood the statement under circumstances calling for a response and by words or conduct adopted it as true. That standard is amply met here. For example, shortly after the exchange quoted above is the statement by defendant "if they did, oh man, why man?" indicating defendant both heard what Bennett said and understood it referred to the Uzi Brown had put in Harris's briefcase. Moreover, the trial court told the jurors to listen to the tape and decide for themselves what was being said and by whom. Thus, it was up to the jury to decide what words defendant spoke and whether through his words or silence he adopted the comments by Redmond and Bennett. In doing so, the jury could have considered numerous factors, such as tone of voice and inflection, that are not reflected in the transcript.

Defendant also argues that portions of certain excerpts (1 and 11) were inadmissible because Redmond was recounting his conversations with police, conversations defendant could not have heard. (See Evid. Code, § 1221 [adoptive admission requires that party have "knowledge of the content" of the declarant's statement].) But these statements by Redmond not only recounted his conversations with police but also implicated defendant in the kidnapping and murder of Boyd and Harris. For example, Redmond describes how the police asked him "12 times" whether he had seen defendant shoot the victims, to which defendant's only reply was, "Oh man . . . 12 times." From this response, the jury reasonably could have concluded that by not denying that he had shot the victims, defendant had implicitly adopted the substance of Redmond's statement that defendant was the shooter.

Defendant further contends that the last line or paragraph of certain excerpts of the tape-recorded conversations (1, 4 to 6, 8 to 11, 14, 15, 37 and 41) should have been excluded because the speaker was someone other than defendant and there was no way to determine what defendant said or did in response.[9] We disagree. We have examined each of these statements and conclude they were either innocuous or nonprejudicial in the face of a damaging admission or adoptive admission by defendant earlier in the excerpt. Moreover, although Brown had identified each of the speakers on the tape recording, it was ultimately for the jury to decide who was speaking. In some instances, the jury may have concluded that the person making the last statement on the excerpt was not Redmond or Bennett but defendant.

Even assuming some of the challenged excerpt portions should not have been admitted, defendant suffered no possible prejudice. The trial court instructed the jury to consider statements by Redmond and Bennett only to the extent defendant through his own comments or conduct had adopted those statements. We presume the jury followed this instruction. (*People v. Turner, supra,* 8 Cal.4th at p. 190; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].)

Moreover, the jury reasonably could have concluded from defendant's comments in other excerpts not challenged here that defendant had admitted being the shooter. For example, defendant made the following statement referring to the police having learned the details of the crime from Brown: "No mother fucker didn't see me shoot no-mother-fuckin-body. Tell you the truth, the mother fucker that told them that didn't really see you know, they

---

[9] For example, the final paragraph of the first excerpt quotes Redmond as stating that the police asked him whether he knew of any object that defendant had touched, and recounting his response as "I told them 'no' I can't remember." The excerpt includes no reply by defendant.

just heard, you know what I'm sayin'?"[10] Although any inadmissible hearsay statements of Redmond and Bennett might have incrementally bolstered Brown's credibility, it is not reasonably probable that their admission affected the verdict (*People v. Watson, supra,* 46 Cal.2d 818, 836) because they were inconsequential in light of the vast quantity of admissible, highly damaging evidence on the tape in the form of defendant's own statements and adoptive admissions.

Finally, defendant faults the trial court for failing to consider each excerpt individually in ruling on admissibility. Rather, the court simply concluded that the "overall scene" was one in which defendant would have been expected to object, and that any statements that were not adoptive admissions were admissible to give context to defendant's statements. Even had the trial court individually considered each excerpt, however, there is no reasonable probability that the outcome of the trial would have been more favorable to defendant (*People v. Watson, supra,* 46 Cal.2d at p. 836; see Evid. Code, § 353, subd. (b)) because, as we have concluded, all of the excerpts defendant challenges on appeal were properly admitted. For the same reason, we reject defendant's contention that admission of the tape excerpts without individual consideration violated his Fifth and Fourteenth Amendment right to due process of law, his Sixth Amendment right to confront and cross-examine witnesses, and his Eighth Amendment right to reliability in the guilt and sentencing determinations.

### 4. *Special Instruction A*

At a hearing on jury instructions, the trial court said it was disinclined to instruct on CALJIC No. 2.71.5 (adoptive admissions—silence, false or evasive reply to accusation) because there were no direct accusations made to defendant. In addition, defense counsel objected to CALJIC No. 2.71.5 on the ground that defendant's silence in the face of accusatory statements was based on his Fifth Amendment right to remain silent. The court also said it would not give CALJIC No. 3.13 (accomplices may not corroborate one another) because cosuspects Redmond and Bennett did not testify.

Ultimately, the court gave an alternative to CALJIC Nos. 2.71.5 and 3.13, entitled "Special Instruction A," which provided: "As to People's Exhibit 31, the tape recording of conversations in the holding cell area of the West Los

---

[10] Defendant also made the following statements about what Brown had told the police: "Yeah, but damn, what De De [Brown] done told them, that's what' goin' to count. That's what goin' to hurt right there. Man, they told me, *just like a picture.* 'You asshole mother fucker. You took the girl out first and bam, you shot the girl. And then you took the dude out, then bam, then you shot the dude.' " "I wonder if he tell where he pass Stanley the gun, and Stanley shot them."

Angeles Station of the L.A.P.D., you are instructed as follows: [¶] Statements on that tape which you find beyond a reasonable doubt to have been spoken by the defendant may be considered by you to determine if they constitute an admission or admissions as previously defined in these instructions. If you find that the defendant made any admissions, such admissions may be considered in determining whether the testimony of DeAndre Brown has been corroborated. [¶] Statements on that tape made by any person other than defendant may not, in and of themselves, be considered as possible corroboration of the testimony of DeAndre Brown. Such statements may be considered by you only for the purpose of explaining what the defendant meant by any statements made by him and/or as a possible implied admission by the defendant. Such statements may be considered by you for one or both of those purposes only if you find both of the following to be true beyond a reasonable doubt: One, the defendant heard and understood the other [person's] statement; and Two, the defendant expressly or impliedly indicated that the other [person's] statement was true. [¶] Any implied admission by the defendant may be considered as possible corroboration of the testimony of DeAndre Brown."

 Defendant now contends that the trial court had a duty to give CALJIC No. 2.71.5 on its own initiative. We disagree. A trial court has no duty to so instruct the jury without a request from counsel. (*People v. Carter, supra,* 30 Cal.4th at pp. 1197–1198.)

 Defendant further argues that Special Instruction A was defective in several respects. Because defendant *expressly agreed* to this instruction, he is barred from challenging it on appeal under the doctrine of invited error. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Cooper* (1991) 53 Cal.3d 771, 830–831 [281 Cal.Rptr. 90, 809 P.2d 865].) In any event, defendant's attacks on the instruction lack merit.

Contrary to defendant's contention, Special Instruction A was not defective in failing to tell the jury that a statement made by defendant could not be an adoptive admission (or, in the court's terminology, an "implied" admission) unless it responded to an accusation against him. For the adoptive admission exception to the hearsay rule to apply, no "direct accusation in so many words" is necessary. (*People v. Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so. (*Ibid.*) Here, Special Instruction A informed the jury of these requirements by noting that defendant had to have "heard and understood" the declarant's statement and "expressly or impliedly indicated its truth."

Defendant next contends that Special Instruction A failed to inform the jury that a defendant must have "knowledge of the content" of the declarant's statement. (See Evid. Code, § 1221.) According to defendant, the knowledge requirement refers not just to knowledge of the words the declarant spoke, but more specifically to knowledge of the subject matter referred to in the declarant's statements. Even assuming the instruction did not convey that precise meaning, there was no prejudice to defendant. The jury could not have concluded that, as the instruction stated, defendant "heard and understood" another's statement and "expressly or impliedly indicated that the . . . statement was true" unless the jury also decided that defendant was familiar with the subject matter of the statement to which he impliedly assented.

Defendant complains that Special Instruction A was inadequate because it lacked the admonition in CALJIC No. 2.71.5 that the declarant's statements cannot be considered for their truth. We disagree. The instruction told the jury that statements of the speakers on the tape other than defendant could be considered only for the purpose of "explaining what the defendant meant by any statements made by him and/or as a possible implied admission." The instruction went on to explain that to conclude that any statement constituted an "implied" admission the jury had to "find both of the following to be true beyond a reasonable doubt: One, the defendant heard and understood the other [person's] statement; and Two, the defendant expressly or impliedly indicated that the other [person's] statement was true." The trial court also instructed under CALJIC No. 2.09 that the jury was to consider evidence only for the limited purpose for which it was admitted. These instructions together advised the jury that the statements by Redmond and Bennett could be considered only insofar as they gave meaning to defendant's own express or implied admissions.

Further, we are not persuaded that Special Instruction A was deficient in not telling the jury that it must disregard any statements of others that it did not find that defendant adopted. (Cf. CALJIC No. 2.71.5.) This notion was implicit in the instruction's admonition that the jury could consider statements of others only if it found "beyond a reasonable doubt" that "the defendant expressly or impliedly indicated that the other [person's] statement was true." CALJIC No. 2.09, which told the jury to consider evidence only for the limited purpose for which it was admitted, reinforced this concept. We presume the jury followed these instructions. (*People v. Turner, supra,* 8 Cal.4th at p. 190; *People v. Mickey, supra,* 54 Cal.3d at p. 689, fn. 17.)

Finally, we note that the inclusion in Special Instruction A of a beyond-a-reasonable-doubt requirement—that the jury find beyond a reasonable doubt that defendant heard and understood another's statement and expressly or impliedly indicated it was true—was substantially more favorable to defendant than the standard instruction on adoptive admissions, CALJIC 2.71.5. We express no opinion, however, on whether such language was required.

In sum, Special Instruction A adequately advised the jury of the requirements for finding adoptive admissions and of their proper use.

### D. *Accomplice Corroboration*

Section 1111 prohibits a conviction based "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." Defendant raises several contentions based on this provision. Specifically, he focuses on accomplice DeAndre Brown's testimony, which at trial provided the primary evidence against defendant. According to defendant, his convictions for two counts of capital murder, robbery, and kidnapping, as well as the arson and grand theft convictions and the robbery-murder and kidnapping-murder special circumstances, all must be set aside because erroneous and confusing jury instructions, misleading prosecutorial argument, and tainted evidence allowed the jury to convict defendant without understanding that Brown's testimony had to be corroborated by independent evidence connecting defendant to the crimes. Defendant also asserts that the instructions did not properly inform the jury that statements by the other accomplices—Redmond and Bennett—could not be used to corroborate Brown's testimony. We reject these contentions.

### 1. *Facts*

At the guilt phase of defendant's trial, accomplice Brown testified, giving his firsthand account of the kidnappings and murders of Boyd and Harris. The prosecution sought to corroborate Brown's testimony with evidence of the recorded conversations in jail among defendant, Redmond, and Bennett. At one point, the trial court discussed with the prosecutor and defense counsel the procedure for playing that tape. Defense counsel objected to providing the jury with a copy of a transcript of the tape that included initials reflecting Brown's identification of each speaker. The trial court overruled this objection.

Ultimately, the court admonished the jury: "The attorneys have listened to the . . . tape and followed it in the transcript, and have reached an agreement that certain words were said. [¶] This agreement does not cover who said them, it does not cover anything other than these are the words that the attorneys hear . . . . [¶] You will find that on the transcript, there are three sets of initials: S.D., D.R., and D.B., standing respectively for the names Stanley Davis [defendant], Damon Redmond, Donald Bennett. . . . [¶] That merely indicates that Mr. Brown is going to testify that, in his opinion, that statement that you hear is made by the person whose initials are indicated. It does not amount to an agreement by the attorneys that in fact that is the person talking on the tape. It's merely a quick and short way of having you understand that that's the voice identification made by Mr. Brown, and it has no other significance. . . . [¶] And I want to emphasize that the placing of the initials to the side of the statement indicates only one thing: That it's Mr. Brown's opinion based on his experience with the individuals that that's who's talking. . . . [¶] You must understand that the agreement between the lawyers is only that these are the words being said. They are not agreeing that these things pertain to this case. Whether they do or not, that's for you to decide. [¶] More than that, what relevancy they have, if they do apply to this case, what weight is to be given to them, what significance, that's for you to decide. [¶] Also, you must understand that you are the final judges of what is said on this tape recording. [¶] This transcript has been prepared as an aid to following through, but it is not binding upon you."

The jury then heard the tape recording. Thereafter, Brown testified that he was in the courtroom when the tape was played, that he had seen the transcript of the tape, and that the initials on the transcript accurately reflected who was speaking, except that he could not say for sure that the passages marked "D.B." were actually spoken by Bennett.

The trial court gave CALJIC Nos. 2.09 (evidence admitted for a limited purpose), 2.71 (admissions), 3.10 (definition of an accomplice), 3.11 (testimony of an accomplice must be corroborated by other evidence connecting defendant with the offense), 3.12 (sufficiency of evidence to corroborate an accomplice), 3.16 (Brown an accomplice as a matter of law), and 3.18 (accomplice testimony should be viewed with distrust). The court also gave Special Instruction A, which told the jury to consider the recorded statements of the speakers other than defendant only insofar as they explained defendant's statements. In addition, the court gave "Special Instruction B," which read in pertinent part: "The initials which appear in the left margin of People's Exhibit [No.] 32 only represent De Andre Brown's opinion as to the identity of the speaker . . . . Counsel have not agreed as to the identity of any speaker on People's Exhibit [No.] 31. *The identity of any speaker on People's Exhibit [No.] 31 is for you to decide.*"

2. *Claim of instructional error—use of Brown's voice identifications*

Defendant contends that Special Instruction A was deficient in not telling the jury that, in determining whether statements on the tape corroborated Brown's trial testimony describing the circumstances of the killings, it could not rely on the written initials on the transcript that Brown matched with voices on the tape. We reject this contention.

Section 1111 requires corroboration of accomplice testimony. It provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*)

The trial court instructed the jury that Brown was an accomplice as a matter of law. Thus, for the jury to rely on Brown's trial testimony about the circumstances of the robberies, kidnappings and murders of Boyd and Harris, it had to conclude that evidence independent of Brown's testimony linked defendant to those crimes. (§ 1111; *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1128–1130; *People v. Tewksbury* (1976) 15 Cal.3d 953, 969 [127 Cal.Rptr. 135, 544 P.2d 1335].) Such evidence could not come from the other two accomplices, Redmond and Bennett (see *People v. Tewksbury, supra,* 15 Cal.3d at p. 958), or from Brown himself (see *People v. Andrews* (1989) 49 Cal.3d 200, 214 [260 Cal.Rptr. 583, 776 P.2d 285]). Rather, under section 1111, there had to be evidence tending to connect defendant with the crimes "without aid or assistance from the testimony of" Brown, for instance, his testimony that the initialing on the tape transcript accurately reflected who was speaking. (*People v. Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].) Such independent evidence " 'need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it *does not require interpretation and direction from the testimony of the accomplice* yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth . . . .' [Citations.]" (*Id.* at p. 769, italics added; see also *People v. Rodrigues, supra,* at p. 1128.)

In this case, the only source of independent corroboration of Brown's trial testimony was the jailhouse tape recording on which defendant, through his statements and adoptive admissions, implicated himself in the crimes. Thus, the task for the jury was to determine, independently of Brown's testimony,

*including his voice identifications*, whether any statements by defendant on that tape linked him to the charged crimes. Once the jury did so, it was free to rely on the whole of Brown's testimony, *including his identification of the other voices on the tape*, in deciding the question of defendant's guilt. As we explain, the jury instructions adequately advised the jury.[11]

CALJIC No. 3.12, given here, told the jury that accomplice Brown's testimony had to be corroborated by evidence which, "if believed, by itself and without any aid, interpretation or direction from" Brown, connected defendant to the crimes. The instruction continued: "In determining whether an accomplice has been corroborated, you must first *assume the testimony of the accomplice has been removed from the case.* You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime." In addition, Special Instruction B specifically told the jury that the parties did not agree that the initials on the transcript corresponding to Brown's voice identifications accurately reflected who was speaking, and that "the identity of any speaker" on the tape was a question for the jury. Given these instructions, the jury would have understood that, before it could consider Brown's trial testimony describing the circumstances of the crimes, it had to decide, without the aid of Brown's voice identifications, that defendant's statements on the tape connected him to those crimes.

Defendant contends that the instructions failed to advise the jury adequately that it could not use Brown's voice identifications to assist it in finding the independent corroboration that section 1111 requires. Thus, he asserts the instructions did not preclude the jury from using evidence derived from accomplice Brown (his voice identifications) to aid it in finding the required corroboration. Assuming for the sake of argument that defendant is not barred from raising this claim under the doctrine of invited error, because he expressly consented to Special Instruction A (see *ante*, at p. 539; *People v. Rodrigues, supra,* 8 Cal.4th at p. 1135), the instructions were proper.

As explained above, CALJIC No. 3.12 and Special Instruction B correctly explained to the jury that it had to disregard Brown's testimony, including his voice identifications, before attempting to find statements by defendant on the jailhouse tape linking defendant to the crimes. Thus, these instructions

---

[11] The underlying assumption of the trial court's instructions to the jury on accomplice testimony seems to have been that the prosecution had to establish by evidence independent of the testimony of accomplice Brown that defendant was the actual shooter of the two victims and that he therefore entertained the intent to kill required to prove the felony-murder special circumstances under *Carlos, supra,* 35 Cal.3d 131. We have never so held. (See *People v Hamilton* (1989) 48 Cal.3d 1142, 1177 [259 Cal.Rptr. 701, 774 P.2d 730] [independent corroboration required only to prove the crimes underlying the felony-murder special circumstances].)

correctly told the jury how to find independent corroboration of Brown on the jailhouse tape. Defendant posits that the jury might have concluded that Special Instruction A superseded the general instructions on accomplice testimony, including CALJIC No. 3.12. Not so. The trial court admonished the jury, under CALJIC No. 1.01, to view the instructions as a whole and not to "single out any particular sentence or any individual instruction and ignore the others." We presume the jury followed this instruction. (*People v. Turner*, *supra*, 8 Cal.4th at p. 190; *People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.)

Defendant contends that the jury could not have followed the trial court's instructions because the jailhouse tape—the only possible source of independent corroboration—was tainted by Brown's voice identifications. According to defendant, the jury would have relied on Brown's voice identifications as reflected by the initials on the tape's transcript in determining the identity of each speaker. We disagree. We presume that the jury followed the court's instruction to "assume the testimony of [Brown] has been removed from the case" *before* the jury itself decided upon the identity of each speaker on the tape and then determined that some of defendant's comments provided independent corroboration for Brown's trial testimony.

Defendant suggests that the jury would not have understood that the testimony of Brown referred to in CALJIC No. 3.12 included the initials on the transcript corresponding to Brown's voice identifications. But defense counsel in argument specifically told the jury to "draw a line through the initials" and "remove the initials from the transcript because that's Brown." And the prosecutor argued "no one attacked Deandre Brown's version of who the voices were, *the legend on the tape.*" In light of these arguments, the jury would have understood that Brown's testimony included his voice identifications and the initials on the transcript, and that these could not be considered when the jury determined who was speaking on the tape.

Defendant also contends that comments by the prosecutor confused the jury about its obligation to consider corroborating evidence before considering Brown's testimony. For example, the prosecutor stated that Brown was the only "direct independent source of evidence in this case presented by a live witness to establish whose voices are on that tape," and that "the most obvious person you call to identify the voices and to make use of that tape" was Brown. We disagree. The prosecutor correctly told the jury that the corroborating evidence had to be independent of Brown's testimony, and that the jury had to determine the identities of the speakers on the tape. The prosecutor suggested that in light of Detective Evans's and Detective DeAnda's trial testimony that Redmond and Bennett had told them they were present at the murder scene, the jurors could logically deduce that the person

who stated on the tape "I didn't tell them" must have been defendant. No comment by the prosecutor misled the jury.

### 3. *Insufficiency of corroborating evidence*

Defendant contends that the corroborating evidence itself was insufficient to sustain his convictions for the murders, robberies, and kidnappings of Boyd and Harris and the special circumstances of robbery murder and kidnapping murder because the jury could not have found evidence linking defendant to the crimes independent of Brown's testimony. (See *People v. Hamilton, supra,* 48 Cal.3d 1142, 1177 [when special circumstance requires proof of some other crime, that crime cannot be proved by the uncorroborated testimony of an accomplice]; see also *People v. Bowley* (1963) 59 Cal.2d 855, 861–862 [31 Cal.Rptr. 471, 382 P.2d 591] [corroborating evidence was insufficient to sustain defendant's conviction where the value of the evidence rested entirely on the testimony of the accomplice].) Had, for example, Brown's testimony been necessary to identify the voices on the tape, the independent corroboration rule would not have been satisfied. (See *People v. Bowley, supra,* 59 Cal.2d at p. 862, fn. 6.) But, as we have explained, that was not the case. In addition to the methods the prosecutor outlined, there were a number of ways for the jury to identify the voices on the tape. For example, as defense counsel suggested, in several excerpts (9, 26, 40) one speaker addresses another as "Stan." From that comment, the jury could have concluded that the person who responded in these excerpts was defendant, Stanley Davis, and having thereby identified defendant's voice, the jury could have determined when defendant was the speaker elsewhere on the tape.[12]

Having listened to the tape, we conclude that defendant's voice is identifiable and distinguishable from the voices of the other speakers. Moreover, in several comments defendant makes (excerpts 9, 15, 16, 23, 24, 26, 27, 31, 34, 38, 45, and 48) there are links to the charged crimes of murder, robbery, and kidnapping. These comments thus sufficiently provide the legal corroboration

---

[12] The following provided other ways in which the jury could have identified defendant's voice independent of Brown's testimony or the initials on the transcript identifying the speakers: In excerpt 16 a voice says "the only reason why I got caught [was] because I turned myself in." The evidence at trial was that defendant was the only one of the four participants who had turned himself in to the police. Accordingly, the jury could have concluded that the person making this statement was defendant. In excerpt 18, the speaker recounts his conversation with police officers, quoting the officer as saying " 'mother fuckin' Davis, you the one that gun down the victim and took his . . . GTI rabbit.' " The jury could have concluded that the speaker was defendant. Finally, Detective DeAnda testified that at one point during the taping he entered defendant's cell and engaged in a conversation with him. The jury could have determined that the other participant in the conversation, which became excerpt 42, was defendant.

that section 1111 requires. Accordingly, substantial, independent evidence corroborates Brown's trial testimony and supports defendant's convictions as well as the findings on the special circumstances of murder in the course of a robbery and murder in the course of kidnapping for robbery.

### 4. Use of Redmond's and Bennett's statements

Defendant contends that Special Instruction A did not adequately tell the jury that hearsay statements by accomplices Redmond and Bennett, both on and off the tape, could not be used to corroborate Brown's trial testimony. Defendant further contends that the trial court erred in declining to instruct the jury that Redmond and Bennett were accomplices as a matter of law (CALJIC No. 3.16) and by declining to give CALJIC No. 3.13, which, as applicable here, provides: "The required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of [his] accomplices, but must come from other evidence." The trial court refused to give these instructions as potentially confusing to the jury because Redmond and Bennett did not testify, and also because Redmond and Bennett lacked any motive to obtain a benefit from police when they made the statements recorded on the tape. Defendant argues that without these CALJIC instructions, Special Instruction A improperly allowed the jury to use the hearsay statements of Redmond and Bennett on the tape to corroborate Brown and to corroborate each other. We disagree.

Section 1111 serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1132; *People v. Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485].) CALJIC No. 3.13 "acknowledges this danger in the context of multiple accomplices who may be motivated by self-interest to offer complementary but inaccurate testimony adverse to the defendant." (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1132.) That danger was not implicated here with respect to Bennett and Redmond, both of whose statements on the tape recording were not made to law enforcement officials in the hope of gaining leniency or immunity. Rather, those statements were made to each other and to defendant in a conversation in a jail cell that all three apparently believed to be private. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1133; cf. *People v. Belton, supra,* 23 Cal.3d at pp. 519, 525.) In this context, there was no need to instruct the jury that Redmond and Bennett were accomplices whose statements could not be used to corroborate Brown. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1133 [CALJIC No. 3.13 unnecessary where accomplice's utterance was made in defendant's presence during the commission of the crimes for the reasonably apparent purpose of facilitating a robbery].)

### 5. *Claim of federal constitutional error*

Defendant contends the trial court's failure to correctly instruct the jury on section 1111's accomplice corroboration requirement, together with misleading prosecutorial argument and tainted evidence, violated his right to confront and cross-examine witnesses under the Sixth Amendment to the federal Constitution. He relies on *Lee v. Illinois* (1986) 476 U.S. 530 [90 L.Ed.2d 514, 106 S.Ct. 2056], and *Mason v. Scully* (2d Cir. 1994) 16 F.3d 38, cases involving prosecutorial use of a codefendant's confession as substantive evidence against a defendant in violation of the confrontation clause. Here, by contrast, there was no confrontation violation because the statements of Redmond and Bennett were not admitted as substantive evidence against defendant, but only to give meaning to defendant's admissions on the tape. (See *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 [158 L.Ed.2d 177, 124 S.Ct. 1354] [hearsay statements not admitted for their truth do not violate the confrontation clause]; accord, *People v. Turner, supra,* 8 Cal.4th at pp. 190–191; *People v. Preston, supra,* 9 Cal.3d at pp. 315–316.)

Further, because there was no violation of California law governing accomplice corroboration in this case, we need not decide whether any such violation would have infringed defendant's federal due process rights on a theory that it denied him a state-created right. (*Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227].)

Finally, defendant contends the trial court's failure to ensure compliance with the accomplice corroboration rule violated his Eighth Amendment right to reliability in the death penalty determination. Our conclusion that the trial court fully complied with the requirements of section 1111 defeats this argument.

### E. *Voice Identification Testimony by Police*

Defendant asserts that allowing Officer Evans and Detectives DeAnda and Charles Brown to testify about what occurred during police questioning of defendant, Redmond, and Bennett violated the hearsay rule and defendant's Fifth Amendment rights as protected by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). We disagree.

### 1. *Facts*

Over defendant's hearsay objection, the trial court allowed Officer Evans and Detective DeAnda to testify that, during interrogation, both Redmond and Bennett admitted being present at the murder scene. The prosecution introduced this testimony to show that the voice on the tape saying "I didn't tell

them" belonged to defendant. The court also permitted testimony by Detective Brown that, when questioning defendant, Brown accused defendant of the 1984 kidnapping of Kingsmill and the 1985 Boyd and Harris murders.[13] With respect to Detective Brown's testimony, defendant raised a *Miranda* objection and asserted that the testimony was more prejudicial than probative. The trial court overruled these objections.[14]

After Officer Evans and Detective DeAnda testified, but before Detective Brown did so, the trial court admonished the jury: "Ladies and Gentlemen of the jury, I want to be very sure that you understand what is taking place here and what is not. [¶] As I understand it, the district attorney is attempting to show to you that the person who made the statement that is referred to on People's 32, this transcript, excerpt 18 at page 9, they're—the district attorney's going to argue to you that that excerpt is a statement made by Mr. Davis. [¶] And in attempting to establish that it was made by Mr. Davis, they're going to show that the inner quotation in . . . the excerpt at 18 referred to an earlier conversation, that that was a conversation that [Detective] Brown had with Mr. Davis. . . . [¶] [Detective Brown is] going to tell you that he made a certain statement to Mr. Davis. You'll be the ones to decide whether he did nor didn't. [¶] If you find that he did make a certain statement, that statement is not to be considered by you for the truth of what Detective Brown said to Mr. Davis. It's merely to show that that statement was made to Mr. Davis and circumstantially the D.A.'s then going to argue that the person who spoke the excerpt 18 in referring to that statement must have been Mr. Davis because he's the one that Detective Brown said he made that statement to. [¶] But again, I emphasize—and I can't emphasize it too strongly that what, if anything, you find that Detective Brown said to Mr. Davis is not to be considered for the truth of its content. The issue is whether he made that statement to Mr. Davis, and that's the only purpose for which it's being and any similar officer dealing with the transcript and my comments apply to [*sic*] the same fashion."

---

[13] Detective Charles Brown testified that during his interview with defendant on October 6, 1985, the detective had described the 1984 Kingsmill incident in these words: "You walked up to some guy over there in Westwood and stuck a gun to his head and put him in his car, drove him down to South Central L.A., dropped him off and kept his car and got arrested." "Let me put it to you this way, Stanley, this one's exactly like the other one except people got killed." Detective Brown then turned to the murders of Harris and Boyd: "You were last seen with them. You took the gun and you took the first one out in the bushes and you said you were just going to take their clothes, then you shot that one. And then you came back and then you dragged the other one out of the car and you took him out there and you shot him."

[14] Earlier in the trial, the court had granted defendant's motion to suppress his own statements to police on *Miranda* grounds.

### 2. *Testimony of Detective DeAnda and Officer Evans*

Defendant contends the trial court erred in allowing the prosecution to introduce inadmissible hearsay through the testimony of Detective DeAnda and Officer Evans about admissions by Redmond and Bennett that they had been present at the murder scene. We disagree.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and *that is offered to prove the truth of the matter stated.*" (Evid. Code, § 1200, subd. (a), italics added.) Here, the trial court did not admit the police testimony for its truth—that is, that accomplices Redmond and Bennett were actually present at the crime scene—but only to show what Bennett and Redmond had said to the officers before the recording of the jailhouse tape. Thus, the police testimony was not hearsay. For the same reason, it did not violate defendant's rights under the confrontation clause of the Sixth Amendment to the federal Constitution. (*Crawford v. Washington, supra,* 541 U.S. at p. 59, fn. 9; accord, *People v. Turner, supra,* 8 Cal.4th at pp. 190–191; *People v. Preston, supra,* 9 Cal.3d at pp. 315–316.)

Defendant makes several other contentions about the testimony of Detective DeAnda and Officer Evans. For instance, he contends that it was not probative of the identity of the speakers on the jailhouse tape, that any possible probative value was outweighed by the prejudicial effect of the testimony, that the prosecutor failed to use the least prejudicial means to identify the voices on the tape, and that the trial court erred in not giving on its own motion a limiting instruction that the jury could not consider for their truth the comments Redmond and Bennett made to the officers. Because defendant failed to request such a limiting instruction, on appeal he may not complain of the lack of one. (See *People v. Lewis* (2001) 25 Cal.4th 610, 638 [106 Cal.Rptr.2d 629, 22 P.3d 392].) In any event, having considered each of these claims, we conclude that none has merit.

Defendant further insists that the prosecutor misstated the evidence in closing argument when he said that accomplices Redmond and Bennett were "the only ones" who admitted being present at the murder scene, when no officer so testified. Defendant adds that because during police questioning he had invoked his *Miranda* rights, no officer could testify to his statements that he had or had not been present at the murder scene. For a prosecutor to misstate the evidence is prosecutorial misconduct. (*Darden v. Wainwright* (1986) 477 U.S. 168, 182 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *People v. Carrera* (1989) 49 Cal.3d 291, 320 [261 Cal.Rptr. 348, 777 P.2d 121].) Here, however, defendant's counsel failed to object to the prosecutor's statement. Review on appeal is therefore barred unless an admonition would not have cured the harm. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000–1001

[108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Here, any harm could have been cured by an instruction to disregard the prosecutor's comment in view of the lack of evidence. Accordingly, defendant has forfeited this claim on appeal.

 Finally, defendant contends that his counsel's failure to object to the prosecutor's comment was ineffective assistance of counsel under the Sixth Amendment to the United States Constitution. To prevail on such a claim, defendant must show both: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced his defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–694 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839].) To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (See *Strickland v. Washington, supra,* 466 U.S. at pp. 693–694; *In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].) A reasonable probability is " 'a probability sufficient to undermine confidence in the outcome.' " (*In re Cordero, supra,* 46 Cal.3d at p. 180, quoting *Strickland v. Washington, supra,* 466 U.S. at pp. 693–694.)

Here, we need not address whether counsel's performance was deficient, because we find no reasonable probability that, had counsel objected to the prosecutor's statement, the result of the proceeding would have differed. As we have explained, there were numerous methods for the jury to determine who was speaking on the tape. The prosecutor's invitation to infer that defendant had not admitted to police that he had been present at the murder scene was only one of those methods. Even absent that method, we are confident that the jury could have identified the voices with sufficient precision to find statements of defendant that corroborated Brown. Accordingly, defendant's ineffective assistance of counsel claim fails.

### 3. *Testimony of Detective Brown*

Defendant asserts the trial court erred in permitting Detective Brown to recount statements he had made to defendant during questioning after defendant's invocation of his *Miranda* rights. We are aware of no case—and defendant cites none—holding that *Miranda* requires suppression of *police comments* made to a defendant after the defendant invokes his own right to remain silent.

 "Under the familiar requirements of *Miranda*, designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under 'inherently coercive' circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and

intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent. [Citations.] Once having invoked these rights, the accused 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' " (*People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992], citing *Miranda, supra,* 384 U.S. at pp. 444–445, and *Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 [68 L.Ed.2d 378, 101 S.Ct. 1880].) The United States Supreme Court recently held that the failure to give a defendant *Miranda* warnings does not require suppression of physical evidence obtained as a result of the defendant's unwarned but voluntary statements. (*United States v. Patane* (2004) 542 U.S. 630 [159 L.Ed.2d 667, 124 S.Ct. 2620].) Rather, potential violations of the self-incrimination clause "occur, if at all, only upon the admission of unwarned *statements* into evidence at trial." (*Id.* at p. 641 [124 S.Ct. at p. 2629], italics added.) In context, the high court's language makes clear that only the admission into evidence of statements *of the defendant* taken in violation of *Miranda* violates the self-incrimination clause. No such violation occurred here.

### F. *Miranda Mistrial Motion*

Defendant asserts the trial court erred in denying his motion for a mistrial on the grounds that certain excerpts (42 through 49) on the jailhouse tape and transcript that were introduced into evidence were obtained in violation of defendant's rights under the Fifth Amendment to the federal Constitution.

### 1. *Facts*

When defendant was arrested on October 6, 1985, and taken to the West Los Angeles police station, the police advised him of his *Miranda* rights, which he refused to waive. The police then placed him in a holding cell next to codefendants Bennett and Redmond and proceeded to record their conversations. During the taping, Detective DeAnda, who knew that no fingerprints had been found on the Uzi, entered defendant's cell and looked directly at him. The following conversation ensued:

> "Det. DeAnda: Well, you are going to court tomorrow my friend.
>
> "[Defendant]: So what will happen?
>
> "Det. DeAnda: Well we filed murder counts on you.

"[Defendant]: How many?

"Det. DeAnda: Two. Special Circumstances.

"[Defendant]: What's that?

"Det. DeAnda: . . . Special Circumstances means that you can get life in prison without parole or the death penalty.

"[Defendant]: Oh man.

"Det. DeAnda: Alright remember that Uzi?

"[Defendant]: Yeah.

"Det. DeAnda: Think about that little fingerprint on it we'll see ya (Jail door closes).

"[Bennett]: Say what? Is he talking about everybody?

"[Defendant]: No man he talking about me."

After this exchange, defendant made additional incriminating remarks: "Now they trying to say the fingerprints on the Uzi is mine. Man that's what's going to do the shit man. I'm telling you man." "Man if that nigger De De [Brown] don't die, I am going to kick man. The fingerprints on the Uzi is mine. *I know that mother fucker has been handled since I handled it.*"

After the jailhouse tape had been played for the jury, defendant moved to strike the exchange just quoted and the portion of the tape that followed it (excerpts 43 to 49). He asserted that his comments on the tape were obtained in violation of *Miranda*. When the trial court declined to grant the motion, defense counsel moved for a mistrial. The trial court denied that motion, reasoning that the excerpts in question were not central to the prosecution's case and did not violate *Miranda*.

### 2. *Discussion*

Here defendant did not file a timely motion to exclude the challenged excerpts as violating his *Miranda* rights, but rather moved for a mistrial after the jury had already heard the excerpts. Thus, in reviewing the trial court's ruling, we use the deferential abuse of discretion standard. (*People v. Price, supra,* 1 Cal.4th at p. 428; *People v. McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) A trial court should grant a

mistrial only if the defendant will suffer prejudice that is " ' "incurable by admonition or instruction." ' " (*People v. Lucero, supra,* 23 Cal.4th at p. 713; *People v. Hines, supra,* 15 Cal.4th at p. 1038.) In making this assessment of incurable prejudice, a trial court has considerable discretion. (*People v. Hines, supra,* at p. 1038.)

On the facts here, there was no abuse of discretion. As stated earlier, the high court's decision in *Miranda* serves to protect a defendant's Fifth Amendment privilege against self-incrimination. (*Miranda, supra,* 384 U.S. at pp. 444–445.) Suspects who invoke the rights to counsel and to remain silent may not be subjected to further interrogation until counsel is made available or " 'the accused himself initiates further communication.' " (*People v. Sims, supra,* 5 Cal.4th at p. 440.) These rules apply not only when the police engage in express questioning of a suspect, but also when they undertake its "functional equivalent" (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 [64 L.Ed.2d 297, 100 S.Ct. 1682]; see also *Arizona v. Mauro* (1987) 481 U.S. 520, 526–527 [95 L.Ed.2d 458, 107 S.Ct. 1931]; *People v. Sims, supra,* 5 Cal.4th at p. 440), through "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis, supra,* at p. 301, fns. omitted; see also *Arizona v. Mauro, supra,* at pp. 526–527; *People v. Sims, supra,* at p. 440.) In deciding whether police conduct was "reasonably likely" to elicit an incriminating response from the suspect, we consider primarily the perceptions of the suspect rather than the intent of the police. (*Arizona v. Mauro, supra,* at p. 527; *Rhode Island v. Innis, supra,* at p. 301.) Because the dual elements of a police-dominated atmosphere and compulsion are absent when the defendant is unaware that he is speaking to a law enforcement officer, however, *Miranda* is inapplicable when the defendant does not know that the person he is talking to is an agent of the police. (See *Illinois v. Perkins* (1990) 496 U.S. 292, 296–300 [110 L.Ed.2d 243, 110 S.Ct. 2394] [*Miranda* warnings were not required when the police placed the defendant in a cell with an undercover agent who then elicited incriminating statements].)

*People v. Sims, supra,* 5 Cal.4th 405, involved the functional equivalent of interrogation. The defendant, who was arrested in Nevada for the murder of a pizza delivery person in California, invoked his *Miranda* rights. Thereafter, as the officers were preparing to leave the jailhouse interview room, the defendant asked them about being extradited to California or to South Carolina, where he was wanted for additional crimes. During that conversation, a police officer from California described the crime scene—a motel room—and suggested that the defendant had occupied that room and had lured the victim inside when he arrived to deliver a pizza. This court concluded that those statements by the officer were the "functional equivalent" of interrogation because they indirectly accused the defendant of the

crime and thus were likely to induce him to incriminate himself. (*People v. Sims, supra,* 5 Cal.4th at pp. 442–444; see also *In re Albert R.* (1980) 112 Cal.App.3d 783, 793 [169 Cal.Rptr. 553] ["blatantly and flagrantly accusatorial" statements by police are functional equivalent of interrogation]; *United States v. Poole* (9th Cir. 1986) 794 F.2d 462, 466–467.)

The situation here is quite similar. As a preliminary matter, we conclude that Detective DeAnda directly engaged in interrogation when he asked defendant if he "remember[ed] that Uzi." That question, after defendant had invoked his *Miranda* rights, elicited defendant's response, "Yeah," in violation of his privilege against self-incrimination.

Furthermore, when Detective DeAnda said, "Think about that little fingerprint on [the Uzi]," he implied that defendant's fingerprint had been found on the Uzi, and thus indirectly accused defendant of personally shooting the victims. As in *Sims,* this comment was likely to elicit an incriminating response and thus was the functional equivalent of interrogation. (*People v. Sims, supra,* 5 Cal.4th at pp. 442–444; see also *Rhode Island v. Innis, supra,* 446 U.S. at p. 299 ["psychological ploys" such as positing the guilt of the subject may be the functional equivalent of interrogation].)

After the comment about the Uzi, Detective DeAnda left defendant's jail cell. Thereafter, defendant, unaware that police officers were listening to and recording his statements, said to his cellmates: "The fingerprints on the Uzi is mine. I know that mother fucker [the Uzi] has been handled since I handled it." Under the circumstances, defendant "consider[ed] himself in the company of cellmates and not officers," and the coercive atmosphere of custodial interrogation was lacking. (*Illinois v. Perkins, supra,* 496 U.S. at p. 296.) Viewing the situation from defendant's perspective (see *Arizona v. Mauro, supra,* 481 U.S. at p. 527; *Rhode Island v. Innis, supra,* 446 U.S. at p. 301), when he made these statements to his cellmates there was no longer a coercive, police-dominated atmosphere, and no official compulsion for him to speak. Thus, the admission of defendant's incriminating statements made after Detective DeAnda left the cell did not violate his rights under *Miranda.*

Accordingly, we conclude that the only statement challenged here that was admitted in violation of *Miranda* was defendant's affirmative response to Detective DeAnda's question, "remember that Uzi?" It was incriminating to the extent it conveyed to the jury that defendant knew that DeAnda was talking about the Uzi used in the murders of Boyd and Harris. Given the many other damaging admissions defendant made on the tape recording, the error in admitting this very brief exchange was harmless beyond a reasonable doubt. Therefore, the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

### G. Multiple Prosecution of Kingsmill Offenses

Tried together with this September 1985 double murder case was the May 1984 robbery and kidnap for robbery of David Kingsmill. In June 1984, defendant pled guilty to one misdemeanor count of unlawfully taking Kingsmill's car. (Veh. Code, § 10851.) Defendant now contends that prosecuting him in this case for the robbery and kidnap for robbery of Kingsmill violated the prohibition on multiple prosecution under section 654 and *Kellett v. Superior Court* (1966) 63 Cal.2d 822 [48 Cal.Rptr. 366, 409 P.2d 206] (*Kellett*).

#### 1. Facts

During the preliminary hearing, and later in the superior court, defendant sought to enter a special plea of "a former judgment of conviction" to the counts involving Kingsmill based on section 654 and *Kellett*. The trial court summarized the relevant facts: "An individual by the name of David Kingsmill reported being kidnapped and robbed of his vehicle on May 27, 1984. Subsequently on June 1st of 1984 the defendant was apprehended driving the stolen vehicle. [¶] The District Attorney rejected any prosecution on the kidnapping-robbery at that time and referred the matter to the City Attorney's office and a joyriding, 10851(a) of the Vehicle Cod[15] and a receiving stolen property, 496 of the Penal Code, misdemeanors were filed against Mr. Davis. [¶] And he, as I understand it, entered a plea and received a sentence, 60 days in the county jail. [¶] At this time in this case the District Attorney's office has filed in counts IX and X, the robbery of David Kingsmill on May 27th, 1984 and the kidnapping for robbery on that same date. And on the principles of the *Kellett* case, the defense feels that the people are precluded at this time from pursuing these."

Defendant asserted that the newly charged offenses arose from the same act—the taking of Kingsmill's car—for which he had already been convicted, and thus that multiple prosecution was barred. The trial court disagreed: "*Kellett* does not apply to a subsequent prosecution for an offense where . . . at the time of the earlier prosecution the People did not have and reasonably could not have obtained sufficient evidence" to overcome a motion for acquittal at the close of the prosecution's case. The court found that the People could not have prosecuted defendant earlier for the robbery and

---

[15] In 1984, Vehicle Code section 10851, subdivision (a), provided in pertinent part: "Any person who drives or takes a vehicle not his [or her] own, without the consent of the owner thereof, and with intent either permanently or temporarily to deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle . . . is guilty of a public offense . . . ." (Stats. 1983, ch. 889, § 1, p. 3228.) This provision is essentially the same today.

kidnapping because, at the time of defendant's arrest in June 1984, Kingsmill was unable to identify any of his assailants and defendant did not admit his involvement in the robbery and kidnapping of Kingsmill until after he had served his jail sentence for the misdemeanor conviction of the unlawful taking of Kingsmill's car. The trial court concluded that when the prosecution later obtained adequate evidence to warrant convictions for the robbery and kidnapping of Kingsmill, it was entitled to prosecute defendant for those felony offenses, despite defendant's earlier misdemeanor conviction for the unlawful taking of Kingsmill's car.

### 2. *Discussion*[16]

■ Section 654, subdivision (a), provides that when "[a]n act or omission . . . is punishable in different ways by different provisions of the law," "[a]n acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." This provision thus bars multiple prosecutions for the same act or omission where the defendant has already been tried and acquitted, or convicted and sentenced. (*People v. Britt* (2004) 32 Cal.4th 944, 950 [12 Cal.Rptr.3d 66, 87 P.3d 812]; *Kellett, supra,* 63 Cal.2d at p. 825.) This preclusion is primarily "a procedural safeguard against harassment." (*Neal v. State of California* (1960) 55 Cal.2d 11, 21 [9 Cal.Rptr. 607, 357 P.2d 839].)

■ The leading case is our decision in *Kellett.* There, the defendant, who earlier had pled guilty to a misdemeanor offense of exhibiting a firearm in a threatening manner (§ 417), was charged with a felony of being a felon in possession of a firearm (§ 12021). Both charges arose out of the defendant's arrest on a public sidewalk while holding a pistol. We concluded that the second prosecution was barred: "When, as here, the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Kellett, supra,* 63 Cal.2d at p. 827, fn. omitted.) We observed: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor." (*Id.* at pp. 824–825, citing *Neal v. State of California, supra,* 55 Cal.2d at p. 19.)

---

[16] Defendant concedes that neither the federal nor the state double jeopardy provisions (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) barred the later prosecution.

We have recognized an exception to the multiple-prosecution bar where the prosecutor " ' "is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence." ' " (*People v. Scott* (1997) 15 Cal.4th 1188, 1202 [65 Cal.Rptr.2d 240, 939 P.2d 354]; see *Brown v. Ohio* (1977) 432 U.S. 161, 169, fn. 7 [53 L.Ed.2d 187, 97 S.Ct. 2221] [discussing analogous exception to federal double jeopardy bar].) Thus, for example, section 654 does not preclude prosecuting a defendant for the murder of a victim who dies only after an earlier prosecution for attempted murder. (*People v. Scott, supra,* 15 Cal.4th at pp. 1201–1203.) Similarly, section 654 will not bar a later prosecution when the government, despite reasonable efforts, has been unable to discover the facts necessary to sustain a conviction on the more serious crime. (See *United States v. Stearns* (9th Cir. 1983) 707 F.2d 391, 393.) But this exception applies only when the government "acted with due diligence at the outset but was unable to discover the additional facts necessary to sustain the greater charge." (*Ibid.*) Whether the government exercised due diligence is a question of fact. (*Id.* at p. 394.)

The trial court here concluded that, notwithstanding reasonable efforts, the prosecution could not have proceeded on the kidnapping and robbery charges earlier because neither victim Kingsmill nor anyone else could identify defendant. Substantial evidence supports this conclusion. At the preliminary hearing in this case, Kingsmill testified that after the incident in May 1984, he doubted he could ever identify any of his assailants because he did not have a clear view of them. And at trial, Kingsmill mentioned that he viewed a photo lineup after his Volkswagen was recovered but could not identify anyone. DeAndre Brown testified at defendant's preliminary hearing that after defendant had served his time for the misdemeanor conviction of unlawfully taking Kingsmill's Volkswagen, defendant admitted to him how he had come into possession of that car. Kingsmill's and Brown's testimony amply supports the trial court's conclusions that in June 1984 when defendant was arrested for taking Kingsmill's car, neither Kingsmill nor any other known witness could have provided evidence to establish that defendant had kidnapped or robbed Kingsmill, and thus that section 654 did not bar the later prosecution.

Finally, the policies underlying section 654—preventing harassment of the defendant and the waste of public resources through relitigation of issues (*Kellett, supra,* 63 Cal.2d at pp. 825–827)—would not be served here by holding that the kidnapping and robbery charges were barred. Here, defendant's interest in being free from the harassment of a second trial in relation to the 1984 Kingsmill incident was minimal given that he was already on trial for the much more serious charges arising from the 1985 murders in this case. Further, the public's interest in avoiding the waste of resources through

relitigation was minimal given that defendant pled guilty to unlawfully taking Kingsmill's car, thus dispensing with a need for a trial. Balanced against these minimal interests was the public's weighty interest in prosecuting and punishing defendant for the serious crimes of robbing and kidnapping Kingsmill. (See *id.* at p. 828; see also *In re Dennis B.* (1976) 18 Cal.3d 687, 696 [135 Cal.Rptr. 82, 557 P.2d 514] [noting the "undeniable state interest in prosecuting serious misdemeanors and felonies"].)

## H. *Robbery of Michelle Boyd*

Defendant asserts that misleading prosecutorial argument and inadequate jury instructions violated his rights under state law and the federal Constitution. Thus, he contends, this court must set aside his convictions for the robbery and kidnap for robbery of Michelle Boyd, the special circumstance findings based on the robbery and kidnap for robbery of Boyd, and the felony-murder conviction based on the robbery of Boyd. We agree that the robbery conviction must be set aside, but we otherwise reject these contentions.

### 1. *Facts*

Defendant was charged with robbery and kidnapping for robbery of Boyd, as well as with the separate special-circumstances allegations that he killed Boyd in the course of robbing her and kidnapping her for the purpose of robbery. The information did not specify what property defendant had allegedly taken from Boyd. Defendant also was charged with the grand theft of the Honda, described as "a certain automobile then and there the personal property of" the other murder victim, Brian Harris.

In closing argument relating to the Boyd robbery, the prosecutor argued that the property stolen could have been either the Honda or Boyd's rings, one of which had been recovered from DeAndre Brown. The prosecutor further argued that under the felony-murder rule, all the jury had to do was "find there was a robbery." He added that if the jury found that defendant had participated in a robbery involving any property "in Westwood that night," that evidence would be sufficient under the felony-murder rule to convict defendant of the murder of Boyd.

The trial court instructed the jury under CALJIC Nos. 9.40 (defining robbery), 9.44 (when a robbery is still in progress), 9.54 (kidnapping to commit robbery) 8.81.17 (special circumstances—murder in commission of robbery), 8.10 (murder defined), 8.20 (deliberate and premeditated murder) and 8.21 (first degree felony murder—robbery).

## 2. *Robbery conviction*

Defendant challenges his conviction for the robbery of Boyd on three separate bases. First, defendant contends that inadequate jury instructions and misleading prosecutorial argument led to his conviction under the "legally incorrect" theory that he robbed Boyd of the Honda car. He contends that he could not properly have been convicted of the robbery of Boyd based on the Honda because Boyd was a "mere passenger" in that car, which Harris owned, and thus could not have had actual or constructive possession of it while Harris was in it. (See *People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1142 [47 Cal.Rptr.2d 343] [suggesting that passenger who was *sole occupant* of a vehicle would have sufficient possessory interest to be a robbery victim]; see also *People v. Lopez* (2003) 31 Cal.4th 1051, 1062–1063 [6 Cal.Rptr.3d 432, 79 P.3d 548] [passenger in a car who lacks sufficient possessory interest in it to qualify as a robbery victim when the property taken is the car would qualify as a carjacking victim]; *People v. Hill* (2000) 23 Cal.4th 853, 861, fn. 5 [98 Cal.Rptr.2d 254, 3 P.3d 898].)

Second, defendant contends he was entitled to an instruction on theft (§ 484) as a lesser included offense of robbery with respect to the taking of Boyd's rings because there was evidence from which the jury could have concluded that defendant formed the intent to take the rings after he killed Boyd. (See *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [trial court must instruct the jury on its own initiative on all general principles of law relevant to the issues raised by the evidence]; *People v. Memro* (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [trial court's obligation to instruct on its own initiative encompasses instructions on lesser included offenses when there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser].)

Third, defendant contends the trial court erred by failing to give a unanimity instruction regarding the robbery charge involving victim Boyd.

We need not address the first two of defendant's contentions, for we find the third dispositive. Defendant notes that the prosecution presented evidence of two distinct acts of robbery (the taking of the Honda from Boyd and Harris, and the taking of Boyd's rings) but did not elect which of those two it was relying on to prove the robbery of Boyd. In this situation, defendant asserts, the trial court had to instruct the jury that it must unanimously agree on which act constituted the robbery.[17] (See *People v. Sapp* (2003) 31 Cal.4th

---

[17] CALJIC No. 17.01 is the standard unanimity instruction. As applicable here, it provides: "The defendant is accused of having committed the crime of _____ [in Count _____.] The prosecution has introduced evidence for the purpose of showing that there is more than one

240, 283 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Beardslee* (1991) 53 Cal.3d 68, 93 [279 Cal.Rptr. 276, 806 P.2d 1311] [" 'A unanimity instruction is required . . . if the jurors could . . . disagree which act a defendant committed and yet convict him of the crime charged' "]; *People v. Diedrich* (1982) 31 Cal.3d 263, 280–282 [182 Cal.Rptr. 354, 643 P.2d 971].)

■■■ The record does not reflect that defendant requested a unanimity instruction. Absent such a request, a trial court should instruct on unanimity when the circumstances so warrant. (*People v. Riel, supra,* 22 Cal.4th at p. 1199; *People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8 [261 Cal.Rptr. 348, 777 P.2d 121].) On the facts here, we conclude that defendant was entitled to a unanimity instruction. The evidence disclosed two distinct takings: the taking of Harris's car from Boyd and Harris, and the taking of Boyd's rings from her person. Moreover, the prosecutor argued that the jury could rely on either theory to convict defendant of the robbery of Boyd.

We further conclude that the omission of the unanimity instruction was prejudicial as to the robbery conviction because we cannot ascertain from the record whether some jurors found defendant guilty of robbery based on the taking of the rings while others relied solely on defendant's taking of the Honda. On the facts of this case, some jurors may have had a reasonable doubt as to whether Boyd was still alive when the intent to take her rings was formed while other jurors may have had a doubt about whether Boyd was in possession of Harris's car. Under these circumstances, the trial court's failure to give the unanimity instruction was prejudicial. (See *People v. Diedrich, supra,* 31 Cal.3d at pp. 282–283.)

The Attorney General contends that we may affirm the robbery conviction despite the lack of a unanimity instruction because the taking of the Honda and the taking of the rings were so closely connected as to form one continuous transaction (see *People v. Sapp, supra,* 31 Cal.4th at pp. 284–285; *People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423]), and thus it would have been inconceivable for a juror to believe that defendant committed one robbery, but disbelieve he committed the other (see *People v. Riel, supra,* 22 Cal.4th at pp. 1199–1200; *People v. Carrera, supra,* 49 Cal.3d at pp. 311–312).

---

[act] . . . upon which a conviction [on Count ____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] . . . committed any one or more of the [acts] . . . . However, in order to return a verdict of guilty [to Count ____], all jurors must agree that [he] . . . committed the same [act] [or] . . . [acts] . . . . It is not necessary that the particular [act] . . . agreed upon be stated in your verdict."

We are not persuaded. In each of the cases the Attorney General relies on, we concluded that a unanimity instruction was not required (or, even if required, we found no prejudice) either because the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed defendant committed one act but disbelieved that he committed the other, or because "there was no evidence . . . from which the jury could have found defendant was guilty of" the crime based on one act but not the other. (*People v. Carrera, supra,* 49 Cal.3d at pp. 311–312.) The same cannot be said here. As explained above, the potential defenses to the two acts of robbery were entirely different: as to the car, the defense was that Boyd was not legally in possession of it; as to the rings, the defense was that its taking constituted only the lesser included crime of theft.

■ Further, there was evidence from which the jury could have found defendant not guilty of the robbery of the rings. The greater offense of robbery includes all of the elements of theft, with the additional element of a taking by force or fear. (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].) If the defendant does not harbor the intent to take property from the possessor at the time he applies force or fear, the taking is only a theft, not a robbery. (*Ibid.; People v. Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*).) Here, Brown testified that defendant and his friends intended to steal a car so they could drive to Barstow to rob a store. Although Brown testified that when defendant walked Boyd out into the field, Brown thought that defendant would remove the *clothes* she was wearing (presumably to hinder her escape, as defendant had done when he kidnapped Kingsmill in 1984), Brown did not testify that he believed defendant would take Boyd's *jewelry*. The police ultimately recovered Boyd's wire ring from Brown's girlfriend; never recovered was Boyd's high school senior class ring, which was also missing from her body. According to Brown, he received the wire ring from either Redmond or defendant on the morning after the killings, that is, on October 1, 1985. There was no evidence that the rings were taken from Boyd while she was still alive. And there was no evidence regarding when defendant, or any of his accomplices, formed the intent to take Boyd's rings. On these facts, the jury could have concluded that defendant formed the intent to steal Boyd's rings after he killed her. Such a finding would absolve defendant of guilt of robbery, because one cannot rob a dead person. But these facts would support a theft conviction.

Accordingly, there was evidence from which the jury could have found defendant guilty of robbery based on the car but not the rings. The trial court's failure to instruct on unanimity therefore was prejudicial, and we must set aside the conviction for the robbery of Boyd.

### 3. *Robbery-murder special circumstance*

We find no basis, however, to set aside the robbery-murder special circumstance as to victim Boyd. Although we have assumed, without deciding, that the unanimity requirement applies to special circumstances (e.g., *People v. Sapp, supra,* 31 Cal.4th at pp. 283–285 [rejecting, on the particular facts, a claim that the trial court was required to give a unanimity instruction as to the financial gain special circumstance]; *People v. Mickle* (1991) 54 Cal.3d 140, 178 [284 Cal.Rptr. 511, 814 P.2d 290] [rejecting claim that unanimity instruction actually given as to lewd and lascivious act special circumstance did not result in a valid unanimous verdict]), we have never so held. To the contrary, in *People v. Edwards* (1991) 54 Cal.3d 787, 824 [1 Cal.Rptr.2d 696, 819 P.2d 436], we concluded the trial court was not required to instruct the jury that it must unanimously agree which acts constituted the lying in wait underlying the charged lying-in-wait special circumstance. Rather, as long as each juror was convinced beyond a reasonable doubt that defendant was guilty of lying in wait, as that special circumstance is defined by statute, unanimous agreement as to the theory of lying in wait was not required. (*Ibid.*)

■ Here, we need not decide whether jury unanimity as to the property taken during the robbery underlying the special circumstance was required, because any possible error in failing to instruct that the jury must unanimously agree on a theory of robbery was harmless beyond a reasonable doubt with respect to the special circumstance. That is because, as defendant concedes, the Boyd robbery-murder special circumstance could have been found true based on the murder of Boyd during the robbery of the car from Harris. For the felony-murder rule to apply, the murder victim need not be the target of the underlying felony (*People v. Billa* (2003) 31 Cal.4th 1064, 1070 [6 Cal.Rptr.3d 425, 79 P.3d 542]; *People v. Welch* (1972) 8 Cal.3d 106, 118–119 [104 Cal.Rptr. 217, 501 P.2d 225]; *People v. Johnson* (1972) 28 Cal.App.3d 653, 658 [104 Cal.Rptr. 807]), and we see no reason why a different rule should apply with regard to felony-murder special circumstances.

Defendant argues that this court cannot uphold the special circumstance on this theory because the jury was never instructed on it. In support he cites *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], for the rule that any fact that increases the maximum punishment a defendant is subjected to must be submitted to a jury and unanimously found true beyond a reasonable doubt.

■ We disagree. *Apprendi* and its progeny govern only the question of who, as between judge and jury, must decide the existence of the facts that increase the maximum punishment. Here, *Apprendi*'s requirement is satisfied by our state law requiring the jury unanimously to agree that the murder occurred during the commission of a robbery. We see nothing in *Apprendi* or *Ring* that requires the jury to agree unanimously as to *which* robbery the murder facilitated.

■ Moreover, *Apprendi* error—that is, error in failing to submit a punishment-increasing factual issue to the jury—is subject to harmless error analysis under the beyond-a-reasonable-doubt test of *Chapman v. California, supra,* 386 U.S. at page 23. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326–328 [109 Cal.Rptr.2d 851, 27 P.3d 739] [*Chapman* harmless error standard applies to *Apprendi* error in failing to instruct on element of sentencing enhancement].) Indeed, even when jury instructions completely omit an element of a crime, and therefore deprive the jury of the opportunity to make a finding on that element, a conviction may be upheld under *Chapman* where there is no "record . . . evidence that could rationally lead to a contrary finding" with respect to that element. (*Neder v. United States* (1999) 527 U.S. 1, 19 [144 L.Ed.2d 35, 119 S.Ct. 1827]; see also *People v. Flood* (1998) 18 Cal.4th 470, 504–505 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

Here, even assuming the jury should have been instructed on the theory that Boyd was killed during the robbery of the car from Harris, any error was harmless. The jury found true the robbery-murder special circumstance with respect to victim Harris—that is, that the murder of Harris was carried out during and to advance the commission of the robbery of the car from Harris (*Green, supra,* 27 Cal.3d at pp. 60–61 (see *post,* at p. 568))—and defendant killed Harris and Boyd at the same time. There was no evidence that rationally could have led the jury to conclude that the murder of Boyd was not carried out during and to advance the commission of the robbery of Harris. Accordingly, any error in the jury instructions related to the Boyd robbery count was harmless beyond a reasonable doubt with respect to the Boyd robbery-murder special circumstance.

### 4. *Robbery murder*

Defendant contends we must set aside the murder conviction with respect to Boyd based on the felony-murder theory that the murder took place during a robbery. Defendant asserts the conviction is invalid whether based on the robbery of Boyd's rings or on the robbery of the Honda. With respect to the rings, he points out that an intent to steal that arises *after* the infliction of

the fatal wounds cannot support a felony-murder conviction. (See *People v. Morris* (1988) 46 Cal.3d 1, 23, fn. 9 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]; accord, *Green, supra,* 27 Cal.3d at p. 54, fn. 44.) And he argues that he could not properly have been convicted of robbing Boyd of the car because she did not own or possess it. We disagree. The flaw in the Boyd robbery conviction does not require reversal of the felony-murder conviction. As we have explained, for the felony-murder rule to apply, the murder victim need not be the target of the underlying felony. (*People v. Billa, supra,* 31 Cal.4th at p. 1070; *People v. Welch, supra,* 8 Cal.3d at pp. 118–119.) Here, defendant was properly convicted of robbing Harris of his car, and there was no evidence from which the jury rationally could have concluded that Boyd was not murdered during the perpetration of that robbery. (See *Neder v. United States, supra,* 527 U.S. at p. 19; *People v. Flood, supra,* 18 Cal.4th at pp. 504–505.) Accordingly, there is no basis for disturbing defendant's conviction for the murder of Boyd on a felony-murder theory.

Moreover, the jury returned special verdicts unanimously finding defendant guilty of murder on two separate theories: the willful, deliberate and premeditated murder of Boyd and the felony-murder of Boyd. We have found no basis to invalidate the premeditated murder verdict. Accordingly, the murder conviction stands. (See *People v. Morris, supra,* 46 Cal.3d at p. 24.)

### 5. *Kidnapping for robbery*

 Defendant argues that the kidnap for robbery conviction related to victim Boyd, "insofar as it is based upon the underlying robbery allegation," must be reversed, along with the related special circumstance of murder during a kidnap for robbery.[18] We disagree. A defendant may be convicted of kidnapping for robbery even if the robbery is not completed. (*People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1007 [95 Cal.Rptr. 360]; *People v. Zurica* (1964) 225 Cal.App.2d 25, 32 [37 Cal.Rptr. 118]; *People v. Hernandez* (1950) 100 Cal.App.2d 128, 132 [223 P.2d 71].) All that is required is that the defendant have the specific intent to commit a robbery at

---

[18] The prosecution originally charged defendant with kidnapping-murder special circumstances based on both simple kidnapping (§ 207) and kidnapping for robbery (§ 209). After the jury retired to deliberate, the prosecution moved without objection to amend the kidnapping-murder special-circumstance allegations to delete the reference to simple kidnapping, so that each count alleged that the murders occurred during a kidnapping for robbery. The trial court so amended the information. It is not clear why the prosecution requested this amendment, given that the statutory special circumstance applies to any kidnapping, not just kidnapping-for-robbery. (See § 190.2, subd. (a)(17)(B).)

the time the kidnapping begins. (See *People v. Tribble* (1971) 4 Cal.3d 826, 831–832 [94 Cal.Rptr. 613, 484 P.2d 589]; *People v. Jones* (1997) 58 Cal.App.4th 693, 717 [68 Cal.Rptr.2d 506].) Thus, no matter what property defendant intended to forcibly take from Boyd when he kidnapped her, he still committed a kidnapping for robbery.[19] On this basis, we reject defendant's contentions.

### I. *Other Special Circumstances Instructions*

Defendant claims a violation of his rights protected by state law and the Sixth and Fourteenth Amendments to the federal Constitution in the trial court's failure to instruct on the multiple-murder and kidnapping-for-robbery special circumstances. We are not persuaded.

#### 1. *Facts*

During the guilt phase trial, the trial court discussed jury instructions with counsel. The court proposed that, instead of giving CALJIC No. 8.81.3,[20] it would instruct the jury that it must decide whether defendant was the person who fired the bullet that killed each victim. Then, if the jury found defendant guilty of the murders of Boyd and Harris, the multiple-murder special circumstance would be true as a matter of law. Defendant's counsel and the prosecutor agreed to this procedure.

Thereafter, the trial court instructed the jury under CALJIC No. 8.80: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: 1. The defendant was the person who fired the bullet which killed the victim; 2. The murder was committed while the defendant was engaged in the commission of robbery in violation of Penal Code Section 211; and 3. The murder was committed while the defendant was engaged in the commission of kidnapping for robbery in violation of Penal Code Section

---

[19] We note that the jury instructions here on kidnapping for robbery, requiring that the robbery and kidnapping victims be the same person, were substantially more favorable to defendant than the law required. A defendant may be convicted under section 209, subdivision (b), even when the kidnapping victim is not the victim (or intended victim) of the robbery. (*People v. Laursen* (1972) 8 Cal.3d 192, 200, fn. 7 [104 Cal.Rptr. 425, 501 P.2d 1145]; *People v. Zurica, supra,* 225 Cal.App.2d at p. 32.) Thus, had the jury been so instructed, it could have convicted defendant of kidnapping Boyd for the purpose of robbing Harris of the Honda.

[20] At the time of trial, former CALJIC No. 8.81.3 stated: "To find the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved: [¶] [The] [A] defendant has in this case been convicted of at least one crime of murder of the first degree and one or more crimes of murder of the first or second degree." The instruction is nearly identical today.

209(b)." The court also gave CALJIC Nos. 9.40 (robbery), 9.54 (kidnapping to commit robbery), and 8.81.17 (special circumstances—murder in commission of robbery).

After instructing the jury, and out of the jury's presence, the court stated on the record that the parties agreed "that with respect to the special circumstance allegation concerning multiple murder in counts 1 and 2, that the finding the jury is being asked to make is whether the defendant personally killed the victim in that count. [¶] And it has been agreed that if the jury finds the—that the defendant personally killed each of the victims and is found guilty of count—first degree murder in count 1 and count 2, that that is the legal equivalent of a finding that the allegation . . . concerning multiple murder is true."

### 2. Multiple-murder special circumstance

Defendant now contends that we must set aside the multiple-murder special circumstance because the trial court, under an agreement between the prosecutor and defense counsel, did not give CALJIC No. 8.81.3, which defines the multiple-murder special circumstance, and therefore the jury made no finding on this special circumstance. We disagree. We note that California law provides for a jury finding on the truth of any special circumstance allegation (§ 190.4, subd. (a); *People v. Williams* (1997) 16 Cal.4th 635, 688 [66 Cal.Rptr.2d 573, 941 P.2d 752]) and that the federal Constitution's Sixth Amendment requires a jury determination of any fact, other than the fact of a prior conviction, that increases the penalty for a crime (*Apprendi, supra,* 530 U.S. at pp. 476, 490). Here, however, defendant stipulated that the trial court need not give CALJIC No. 8.81.3, so he is barred from challenging the court's failure to give that instruction under the doctrine of invited error. (See *People v. Barton* (1995) 12 Cal.4th 186, 198 [47 Cal.Rptr.2d 569, 906 P.2d 531].) Moreover, defendant suffered no possible prejudice from the instruction, as explained below.

We test trial court error in removing from jury consideration a required special circumstance finding under the beyond-a-reasonable-doubt test of *Chapman v. California, supra,* 386 U.S. 18, 24. (See *People v. Sengpadychith, supra,* 26 Cal.4th at pp. 326–328; *People v. Williams, supra,* 16 Cal.4th at p. 689.) Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict. (*Chapman, supra,* at

p. 24.) Here, under the instructions given, the jury necessarily found that defendant was the person who fired the bullet which killed both victims, Harris and Boyd, and the jury returned special verdicts unanimously making that finding. This finding, coupled with the jury's guilty verdicts of first degree murder for the killings of Harris and Boyd, was sufficient to establish that defendant was in this case "convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).) Accordingly, the challenged instructional error did not contribute to the verdict.

### 3. *Special circumstance of kidnapping for robbery*

Defendant also asserts that we must set aside both of the kidnapping for robbery special circumstances for instructional error. We disagree. The trial court instructed the jury: "If you find the defendant in this case guilty of murder in the first degree, you must then determine if one or more of the following special circumstances are true or not true: [¶] . . . [¶] 3. The murder was committed while the defendant was engaged in the commission of kidnapping for robbery in violation of Penal Code Section 209(b)." The court further instructed the jury on the elements of kidnapping for robbery, including that defendant had the "specific intent to commit robbery . . . when the kidnapping commence[d]."

Not submitted to the jury was the question whether the two murders were committed to advance an independent felonious purpose of kidnapping to commit robbery, or instead whether the kidnappings were merely incidental to the murders, a requirement derived from *Green, supra,* 27 Cal.3d 1. *Green* states that the purpose of the felony-murder special circumstance is to single out defendants who " 'killed in cold blood in order to advance an independent felonious purpose.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 113 [8 Cal.Rptr.3d 271, 82 P.3d 296], quoting *Green, supra,* 27 Cal.3d at p. 61.) This rule is now reflected in the second paragraph of CALJIC No. 8.81.17, which states (as relevant here) that in order to find a felony-murder special circumstance true, the jury must find that "[t]he murder was committed in order to carry out or advance the commission of the crime of [kidnapping] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [kidnapping] was merely incidental to the commission of the murder." Here, there was no request to instruct the jury on this clarifying language with respect to the special circumstance of kidnapping for robbery.[21] Therefore, the trial court had to give the instruction without request only if some

---

[21] The trial court did give such an instruction with respect to the robbery-murder special circumstance.

significant evidence would have allowed the jury to conclude that the kidnappings for robbery of Boyd and Harris were merely incidental to their murders. (See *People v. Valdez, supra,* 32 Cal.4th at pp. 113–114; *People v. Navarette* (2003) 30 Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Kimble* (1988) 44 Cal.3d 480, 499–503 [244 Cal.Rptr. 148, 749 P.2d 803].) There was no such evidence in this case.

Brown testified that he, defendant, Redmond, and Bennett set out on the evening of September 30, 1985, in Bennett's truck, intending to rob a liquor store in Barstow. Because Bennett did not want to use his own truck in the robbery, the group decided to steal a car. They drove to Westwood, where Redmond and Brown noticed a Honda automobile with a man (Harris) and a woman (Boyd) inside. Defendant and Redmond left the truck but returned shortly thereafter in the Honda, with Boyd in the backseat and Harris in the trunk. The four then drove the two victims to an isolated area. Defendant and Redmond took Boyd and Harris into a field, and moments later Brown heard shots fired. Defendant returned to the car and said he had killed Boyd and Harris because he did not want any witnesses. Defendant, Brown, Redmond, and Bennett, using the Honda taken from the victims, then continued to their original destination, the liquor store in Barstow.

This evidence supports an inference that the purpose of the kidnappings of Boyd and Harris was to facilitate the taking of the Honda for use in the planned liquor store robbery, and that the murders were committed to eliminate the witnesses to the kidnappings and robberies. The evidence that, about one and a half years earlier, defendant had kidnapped Kingsmill in order to take his car strengthened this inference.

Defendant contends, however, that the evidence equally supports an inference that his intent from the outset of the kidnapping was to kill Boyd and Harris to eliminate witnesses to his robbery of the Honda. According to defendant, the jury could have found that his intent when he kidnapped the victims was to rob them of their car *and* kill them. If so, according to defendant, he committed a kidnapping during the commission of a murder for robbery, not a murder during the commission of a kidnapping for robbery. In these circumstances, defendant asserts, he was entitled to an instruction based on *Green, supra,* 27 Cal.3d 1.

We disagree. In finding defendant guilty of kidnapping for robbery, the jury determined that he had the intent to rob victims Boyd and Harris when he kidnapped them, and therefore that the kidnappings served to facilitate the

robberies. Even assuming on the facts of this case that *Green*'s "independent felonious purpose" requirement to "provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not" (*Green, supra,* 27 Cal.3d at p. 61, fn. omitted) would not be satisfied with respect to the special circumstances of kidnapping for robbery, the trial court did not err in failing to instruct the jury on defendant's theory without a request.

A trial court must instruct on its own initiative only on those principles of law "commonly or closely and *openly*" connected with the facts of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903], italics added.) Accordingly, the trial court here had to instruct on the independent felonious purpose principle of *Green* with respect to the kidnapping for robbery only if some significant evidence could have supported a finding that the kidnappings of Boyd and Harris were incidental to their murders. (*People v. Valdez, supra,* 32 Cal.4th at pp. 113–114; *People v. Navarette, supra,* 30 Cal.4th at p. 505; *People v. Kimble, supra,* 44 Cal.3d at pp. 499–503.) There was no significant evidence to support such a finding. Defendant did nothing to develop at trial his current theory that he formed the intent to kill Boyd and Harris before kidnapping them. (See *People v. Navarette, supra,* 30 Cal.4th at p. 505.) Thus, defendant's theory of the case "was not one that the evidence would strongly illuminate and place before the trial court." (*People v. Wade* (1959) 53 Cal.2d 322, 335 [1 Cal.Rptr. 683, 348 P.2d 116].) To the contrary, defendant's theory was "so far under the surface of the facts and theories apparently involved as to remain hidden from even the [defense] until the case reached this court on appeal." (*Ibid.*) Under the circumstances, the trial court was not obligated to instruct the jury with the language from *Green*.

Defendant argues that the failure to so instruct violated his Sixth Amendment right to a jury determination of every fact that may increase the maximum punishment (see *Blakely v. Washington, supra,* 542 U.S. 296 [124 S.Ct. 2531]; *Apprendi, supra,* 530 U.S. 466) and his Fourteenth Amendment right to due process of law (*People v. Odle* (1988) 45 Cal.3d 386, 410 [247 Cal.Rptr. 137, 754 P.2d 184]; *People v. Garcia* (1984) 36 Cal.3d 539, 551 [205 Cal.Rptr. 265, 684 P.2d 826]). We disagree. The *Green* instruction merely clarifies the term "in the commission of" with regard to special circumstance allegations based on felony murder. Here, clarification of that term was unnecessary because, as we have concluded, there was no evidence to support defendant's theory that the kidnappings of Boyd and Harris were merely incidental to their murders. Moreover, we see nothing in the high court's *Blakely* and *Apprendi* decisions that would require such an instruction in the circumstances here.

### J. *Constitutionality of California's Death Penalty Statute*

 Defendant argues that California's death penalty statute violates his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and their state constitutional counterparts. As he acknowledges, we have in the past rejected many of these same arguments. Specifically, we have held that neither the cruel and unusual punishment clause of the Eighth Amendment nor the due process clause of the Fourteenth Amendment requires that the jury make unanimous separate findings as to the truth of aggravating evidence (*People v. Griffin* (2004) 33 Cal.4th 536, 593–594 [15 Cal.Rptr.3d 743, 93 P.3d 344]), or provide a statement of reasons for its penalty decision (*ibid.*), or find unanimously beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances and that death is the appropriate punishment (*ibid.*; *People v. Rodriguez* (1986) 42 Cal.3d 730, 778–779 [230 Cal.Rptr. 667, 726 P.2d 113]). We find no reason to depart from these holdings.

Defendant contends that because various provisions of state law require certain protections in other proceedings where the consequences are less serious than in a capital penalty trial (see §§ 1158 [jury must separately find whether defendant has suffered a prior conviction], 1158a [jury must separately find whether defendant was armed and/or used a firearm], 1163 [jury may be polled], 1170, subd. (c) [court must state reasons for its determinate sentencing choice]), the equal protection clause of the Fourteenth Amendment mandates these same protections in capital sentencing. Not so.

In *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1288 [232 Cal.Rptr. 849, 729 P.2d 115], we considered and rejected a similar argument, concluding that the 1978 death penalty statute did not violate equal protection because it does not allow for proportionality review similar to that provided to noncapital defendants under the determinate sentencing law. Also, applying similar reasoning, we concluded in *People v. Danielson* (1992) 3 Cal.4th 691 [13 Cal.Rptr.2d 1, 838 P.2d 729], that California's 1978 death penalty statute did not violate equal protection in allowing consideration of evidence of unadjudicated offenses and the circumstances of prior offenses involving force or violence. (*Id.* at pp. 719–720, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) As we observed in *Danielson*, "capital case sentencing involves wholly different considerations than ordinary criminal sentencing . . . ." (*Danielson*, at p. 720.)

■ Moreover, we have said that the jury's task in assessing the appropriate penalty in a capital case is an "essentially normative" one in which the jury " 'applies "its own moral standards to the aggravating and mitigating evidence." ' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 192 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Thus, the Legislature properly could conclude that imposing the strict requirements of the beyond-a-reasonable-doubt standard, jury unanimity, and a statement of reasons would be unsuited to capital sentencing. (See *People v. Allen, supra,* 42 Cal.3d at p. 1286.)

Nor do the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Ring v. Arizona, supra,* 536 U.S. 584; *Apprendi, supra,* 530 U.S. 466) compel a different result. (See *People v. Griffin, supra,* 33 Cal.4th at pp. 594–595 [neither *Apprendi* nor *Ring* requires a written statement of reasons for the penalty decision or unanimous jury findings beyond a reasonable doubt on the existence of aggravating circumstances or that the aggravating circumstances outweigh the mitigating]; see also *People v. Prieto* (2003) 30 Cal.4th 226, 262–265 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [*Ring* does not require that jury unanimously find beyond a reasonable doubt that unadjudicated criminal acts involved force or violence; *Ring* imposes no new requirements on California's penalty phase proceedings]; *People v. Ochoa* (2001) 26 Cal.4th 398, 452–454 [110 Cal.Rptr.2d 324, 28 P.3d 78] [*Apprendi* does not restrict the sentencing of California defendants who have been convicted of special circumstances murder].) We decline to revisit those holdings here.

■ Finally, because the federal Constitution does not require application of the reasonable doubt standard to the jury's penalty determinations, trial counsel here was not deficient in not requesting such an instruction. (See *In re Robbins* (1998) 18 Cal.4th 770, 810 [77 Cal.Rptr.2d 153, 959 P.2d 311] [failure to raise a meritless claim is not deficient performance].)

## K. *Cumulative Prejudice*

We have concluded that the Boyd robbery conviction must be vacated. Otherwise, we have found only two guilt phase errors (defendant's absence from the May 16, 1989 pretrial hearing regarding admissibility of the jailhouse tape (see *ante,* at pp. 529–530) and the *Miranda* violation in Detective DeAnda's question to defendant "remember the Uzi?" (see *ante,* at pp. 552–555)) and two special circumstances errors or potential errors (the trial court's failure to instruct the jury that it must unanimously agree on a theory of robbery with respect to the Boyd robbery-murder special circumstance (see *ante,* at pp. 563–564), and the trial court's failure to instruct the jury on the multiple-murder special circumstance (see *ante,* at pp. 567–568)). None of these errors is prejudicial standing alone. Defendant argues that even

if no single error requires reversal of the guilt or penalty judgments, the cumulative effect of all the errors is sufficiently prejudicial to violate the Fourteenth Amendment's due process guarantee of fundamental fairness, warranting reversal. (See *Taylor v. Kentucky* (1978) 436 U.S. 478, 487, fn. 15 [56 L.Ed.2d 468, 98 S.Ct. 1930]; *Mak v. Blodgett* (9th Cir. 1992) 970 F.2d 614, 622.) We disagree.

The cumulative effect of the guilt and special circumstances errors and potential errors does not warrant reversal of defendant's convictions or the special circumstances findings. The evidence amply supported these convictions and special circumstances and, for the reasons explained previously in relation to each error, the evidentiary presentation would not have differed significantly in the absence of the errors.

Nor does our reversal of the robbery conviction, in conjunction with the other errors and potential errors, warrant reversal of the penalty judgment. The jury properly considered all of the evidence and was aware of the circumstances of the Boyd and Harris murders. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 512 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Kelly* (1992) 1 Cal.4th 495, 551 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Even if the jury disagreed as to what property defendant intended to steal from Boyd (or even if the jury concluded that defendant formed the intent to steal Boyd's rings after he killed her), and thus erroneously convicted him of the robbery of Boyd, it would not have given significant independent weight to the conviction for the robbery of Boyd as opposed to the circumstances of the offenses and the aggravating and mitigating evidence. (See *People v. Hillhouse, supra,* 27 Cal.4th at p. 512; *People v. Kelly, supra,* 1 Cal.4th at p. 551.) The questions whether defendant robbed Boyd of the car or the rings, or whether he formed the intent to steal the rings before or after killing Boyd, were critical to the robbery conviction but likely insignificant to the penalty determination. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 512.)

Under these circumstances, the errors or potential errors, singly or in combination, were harmless under any applicable standard and did not render defendant's trial fundamentally unfair. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 128–129 [17 Cal.Rptr.3d 710, 96 P.3d 30] [rejecting claim that cumulative errors rendered the defendant's trial fundamentally unfair]; *People v. Hillhouse, supra,* 27 Cal.4th at p. 512 [finding no reasonable possibility of a different result at the penalty phase absent errors].)

## III. Disposition

We vacate the robbery conviction with respect to victim Michelle Boyd. We affirm the judgment in all other respects.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.